[No. 28113. Department Two. May 19, 1941.]

L. ROMANO ENGINEERING CORPORATION, *Respondent*, v. THE STATE OF WASHINGTON, *Appellant.*[1]

[1]Reported in 113 P. (2d) 549.

The Attorney General, P. H. Winston, John E. Belcher, and L. C. Brodbeck, Assistants, for appellant.

Rummens & Griffin, for respondent.

JEFFERS, J.—This action was brought by L. Romano Engineering Corporation, against the state of Washington, in the early part of May, 1938, to recover for materials and services claimed to have been furnished by plaintiff in the performance of contract No. 2215, between plaintiff and defendant, and for which it has not been paid. Under the terms of the contract, plaintiff constructed about twelve miles of highway in Adams county, from Ritzville north.

Subsequent to the institution of this action, L. Romano, liquidating trustee of L. Romano Engineering Corporation, was substituted for L. Romano Engineering Corporation, as party plaintiff. We will hereinafter refer to the corporation as plaintiff and respondent.

The contract in question was entered into on or about September 19, 1936, and the work thereunder was completed on or before July 21, 1937. Plans and specifications upon which plaintiff bid for this job were made a part of the contract. These plans and specifications included the measurements to which the road was to be constructed, and detailed estimates of quantities of materials to be handled or supplied by plaintiff, with the provision that plaintiff should be paid for the actual services and quantities of materials fur-

nished, at the contract unit prices, whether they over-ran or underran the original estimates.

In its complaint, plaintiff alleges that defendant, acting through its engineers, staked the roadway, and wrongfully, arbitrarily, and capriciously required the roadway to be constructed by plaintiff to an average width of 34.66 feet, instead of thirty feet, as specified in the plans and specifications, and required plaintiff to place materials on this highway to a greater depth than called for by the contract; that, because of this increase in width and depth, plaintiff had to provide for, and place, additional quantities of materials, for which, under the basic contract schedule of prices, de-fendant is indebted to plaintiff in the sum of $39,564. Plaintiff also alleges that defendant, acting through its highway engineer, wrongfully, arbitrarily, and ca-priciously classified improperly materials excavated, thereby depriving plaintiff of $26,141, additional com-pensation due. A further allegation is to the effect that defendant is wrongfully withholding from plain-tiff a retained percentage of fifteen per cent, aggregat-ing $20,145.21.

Other allegations appear in the complaint, but they are not material to this appeal, the trial court having found against plaintiff on these other matters, and plaintiff not having appealed from the judgment entered.

Defendant answered the complaint, denying specifi-cally every material allegation of the complaint, and by way of an affirmative defense, pleaded the statute of limitations as a bar to plaintiff's action.

The trial court found: (1) That the action was com-menced within the time limited by law; (2) that the defendant staked the roadway for an actual width of thirty-four feet, and, acting wrongfully, capriciously, and arbitrarily, required plaintiff to construct the

roadway to an average width of 33.9 feet, rather than to the maximum of thirty feet specified in the plans; (3) that defendant's records were not kept in accordance with the highway as actually constructed, but solely with reference to the original quantities called for in the construction of a highway thirty feet wide; (4) that, because of the increase in the roadway width and thickness, plaintiff was required to and did lay 11,158 additional cubic yards of top surfacing, 12,326 additional cubic yards of base surfacing, 1,915 additional cubic yards of filler, and 11,916 additional cubic yards of selected roadway borrow, for all of which defendant is indebted to plaintiff, under the basic contract schedule, in the sum of $35,229.40; (5) that plaintiff is entitled to an additional $3,041.50 for solid rock excavation, which defendant capriciously and wrongfully misclassified as class A excavation; (6) that there is due and owing from defendant to plaintiff the further sum of $2,500, being a portion of the retained percentage under the contract.

Judgment was entered for plaintiff in the sum of $40,770.90. Defendant has appealed from the judgment entered, and makes ten assignments of error.

Appellant claims the court erred in making each and every one of these findings of fact and the conclusions of law and judgment, for the reason that neither the findings nor the judgment is supported by the evidence. Appellant also assigns error in the admission of certain testimony, over appellant's objection, relative to the number of road approaches actually constructed.

█ Appellant contends this action is barred by Rem. Rev. Stat., Vol. 7A, § 6400-40 [P. C. § 2696-513], which provides:

"Any contracting person . . . who claims a cause of action against the State of Washington arising out of any such contract must bring such suit in the proper court in Thurston county before the expiration

of one hundred and eighty days from and after the final acceptance and the approval of the final estimate of such work by the director of highways; otherwise such action shall be forever barred."

Whether this section does or does not bar the recovery sought in this action is a question which turns upon the time the final estimate for contract No. 2215 was accepted and approved by the director of highways.

This action was commenced May 21, 1938. Appellant contends that the final estimate (defendant's exhibit 18) was duly accepted and approved August 31, 1937, and that this was more than one hundred eighty days before this action was commenced. Respondent, on the other hand, contends that the final estimate was not accepted and approved until August 4, 1938, after this suit was commenced, and that the estimate which appellant treats as the final estimate was only monthly estimate No. 8.

There was a great deal of testimony introduced by the respective parties relative to this matter. The trial court adopted the contention of respondent, and, from the record, there was ample evidence to sustain this ruling. The problem is entirely a factual one, and resolves itself down to the question of whether or not estimate No. 8 is the final estimate on the contract. If estimate No. 8 was the final estimate, more than one hundred eighty days had run after the acceptance and approval by the director of highways before this action was commenced, and the action is barred; if not, the action was timely commenced.

Respondent completed work under this contract on or before July 21, 1937. Prior to this date, seven monthly estimates had been prepared, accepted, approved, and paid. Each of these monthly estimates showed the work completed by respondent during the

preceding month, and the amount to which it was entitled, under the contract price. Eighty-five per cent of this amount was paid respondent, fifteen per cent being retained by the state, as provided by Rem. Rev. Stat., § 10320 [P. C. § 9727-1].

On August 17, 1937, nearly one month after the work on the contract was completed, estimate No. 8 was submitted to, and executed by, respondent. It was approved by the director of highways on August 31, 1937. Two subsequent estimates No. 9 were submitted, and if either of these is the final estimate, the one hundred eighty days had not elapsed before this action was commenced.

When a final estimate is submitted by the state to a contractor, the word "Final" appears on the upper right hand corner of the voucher. L. Romano testified that this word "Final" was not on estimate No. 8 when he executed it. When introduced as exhibits Nos. 17 and 18, on appellant's office copies of estimate No. 8 there appeared the word "Final," in handwriting immediately above the typewritten word "Final" in the upper right hand corner. The typewritten word had been struck out by pen lines, drawn with a pen using blue ink. The handwritten word "Final" had been written in with green ink. It is apparent the striking out and the writing in had been two distinct and separate operations. Appellant failed to present any evidence whatsoever to explain this irregularity on the face of the instrument, either as to when or by whom the word "Final" had been stricken or rewritten.

The trial court, on the evidence before it, would certainly have been warranted in finding either that the typed word "Final" was not on respondent's copy of this voucher at all at the time of its execution by respondent, or that the typed word had been stricken at that time by someone with authority to do so, and

the handwritten word had not yet been substituted, or else that the insertion in handwriting had been unauthorized.

It is the practice of the highway department to accompany the final estimate with release forms. The contractor is required to execute these instruments releasing the state from further liability under the contract, or sign under protest, before the estimate becomes final and the state will make full settlement thereunder. It does not apear that such release forms accompanied estimate No. 8, and it clearly appears that respondent had not executed any form of release, either before or after receiving payment under estimate No. 8. Not only was estimate No. 8 not in the customary form of a final estimate, but also, until the filing of the second amended answer in this case, both the highway department and the attorney general had treated estimate No. 8 as simply the eighth monthly estimate.

In addition to the testimony of Mr. Romano, we have the testimony of Mr. Donnelly, who at the time of this transaction was an assistant attorney general, and who was familiar with this transaction, having advised the highway department relative to the contract, and having participated in some of the negotiations beween Mr. Romano and the department, that estimate No. 8 was not a final estimate and was never so considered.

It further appears that, in December, 1937, A. J. Lynch & Son had instituted an action against respondent, to recover the sum of $900.50, for trucking services alleged to have been rendered to respondent. The state was joined as a party defendant in that action, in order that the plaintiff could foreclose its lien on the retained percentage of fifteen per cent withheld by the state under contract No. 2215. On January 10, 1938, the

court ordered the highway department to pay the retained percentage of $20,397 into court. This order was not complied with, because at that time there was no final estimate on contract No. 2215, and the highway department claimed it was without power to relinquish this fund until such a final estimate had been accepted and approved. For this reason the highway department had the order above referred to rescinded by the court on January 14, 1938.

On December 28, 1937, after considerable negotiation, the highway department submitted a subsequent estimate to respondent. This was labeled "Estimate No. 9 Final," and will be hereinafter referred to as pre-final No. 9. Respondent refused to accept or execute this estimate.

Further negotiation followed, after which pre-final No. 9 was revised and, on March 4, 1938, submitted to respondent again as "Estimate No. 9 Final."

Later, on June 15, 1938, in response to a request from attorneys for respondent, relative to paying the retained percentage into court in the Lynch case, the attorney general, through Mr. Brodbeck, wrote to respondent's attorneys as follows:

"Referring to yours of the 9th inst. relative to the retained percentage, we are informed by the Department of Highways that the Romano Engineering Corporation has never returned the final estimate and consequently the retained percentage cannot be definitely determined."

The court, on July 28, 1938, again entered an order in the Lynch case, directing that the retained percentage be paid into court. On August 3, 1938, Mr. Brodbeck wrote the following letter to respondent's attorneys:

"In order to comply with the order of the court directing payment of the retained percentage into the registry of the court, it will be necessary that the

final estimate submitted to the Romano Engineering Corporation be returned to the Highway Department from which the data may be obtained upon which to fix the correct amount of the retained percentage. . . .

"Accordingly please return the final estimate duly executed . . . ."

On August 4, 1938, in response to the foregoing letter, and relying upon a stipulation of counsel relative to saving respondent's rights in the present action, respondent executed, under protest, final estimate No. 9, to which is attached a rider expressly reserving to respondent whatever rights it may have in the instant case, which had then been commenced.

Respondent argues that the various negotiations between these parties, from July, 1937, until August 4, 1938, were in effect an effort to arrive at an agreeable figure to incorporate into the final estimate. Appellant contends that these negotiations were concerned only with an effort to compromise a disagreement after final estimate had been accepted and approved, i. e., estimate No. 8.

The foregoing evidence is not entirely uncontroverted by the state, there being some evidence tending to show estimate No. 8 was the final estimate. However, on the whole record, it clearly appears that there was ample testimony to sustain the trial court's conclusion that estimate No. 8 was not the final estimate, and that this action was therefore not barred by the statute of limitations.

Before passing to the merits of this case, there is another matter which should be disposed of. On July 31, 1940, there was filed in this court a "Supplemental Transcript on Appeal." This transcript contains, *inter alia*, the affidavits of L. Romano and one Steve Irby, certain portions of the pleadings in the Lynch case, already a part of this record as exhibit

No. 20, and an instrument termed "Memo Opinion—Supplemental Statement of Facts."

Appellant has moved to strike the supplemental "Memo Opinion," the two affidavits, and the pleadings in the Lynch case. We are of the opinion the motion must be granted.

The judgment in this case was signed and filed March 22, 1940. Notice of appeal was served on counsel for respondent on April 13, 1940, and filed April 17, 1940. The so-called supplemental "Memo Opinion" which we are asked to consider was given on June 24, 1940. This was after the original statement of facts had been certified by the trial judge. This supplemental memo opinion purports to state certain conditions which the trial judge observed on his view of the road July 21, 1939. We are of the opinion this supplemental memo opinion, dated June 24, 1940, cannot be considered as a part of the record now before us. This instrument, which, in fact, is nothing more than a colloquy between court and counsel, was given after the record in the case was complete, the judgment made and filed, notice of appeal given, and the statement of facts certified.

The trial court ruled that the two affidavits were not properly a part of the statement of facts, and with this ruling we agree. We are also of the opinion the excerpts from the pleadings in the Lynch case are not properly before us, and cannot be considered. However, as we have stated, all the pleadings in the Lynch case are before us as exhibit No. 20, and have received our consideration.

We desire to say, at the beginning of the discussion of the merits of this case, that this record, consisting of some 1,853 pages of testimony and 220 exhibits, made up very largely of testimony of engineers, has presented its difficulties.

In reaching our conclusion, we have had in mind

that the trial court not only made findings of fact, but also went over and viewed the road on July 21, 1939. We fully appreciate that; unless the evidence preponderates against the findings of the trial court, they will not be disturbed. While we do not deem it necessary to discuss the qualifications of the respective expert witnesses testifying in this case, we have, of course, considered their qualifications and the interest, if any, they were shown to have in the outcome of this litigation. We have also had in mind, and carefully considered, the charges of arbitrary and capricious action on the part of the state's employees, and the arbitrary manner in which it is claimed the state's records were kept on this job.

Our conclusions in this case are based upon an examination of the statement of facts, and not the abstracts.

Respondent's theory of recovery is that, in construction, more material was placed on the roadway and more solid rock excavation was required than was called for in the original plans, or allowed for in the final estimates.

In order that a little better understanding be had of the different classes of material used in the construction of this road, we shall attempt to define them in a general way, and show the respective amounts of the different classes of material as estimated in the plans and specifications, the amounts allowed and paid for by the state, and the excess amounts which the trial court found had actually gone on the road and had not been paid for. We shall first take the material described as "selected roadway borrow."

In constructing a road of this type, the first part the contractor builds is what is termed the graded grade. This we will term the dirt grade, upon which the other materials are placed in order to get a finished

highway. After the graded grade is completed, the first material to be placed on the roadway is the selected roadway borrow, which consists of specially selected gravel material, without rocks or boulders over six inches in diameter, and suitable for the purpose intended. Under the plans, selected roadway borrow was to be placed upon the road to a depth of six inches between certain stations, and to a depth of nine inches between certain other stations. The estimated amount of this material necessary for the construction of this twelve miles of road, as shown by the plans, was 45,690 cubic yards. The actual amount allowed by the state, and paid for, was 45,514 cubic yards. The amount allowed by the trial court, over that allowed and paid for by the state was 11,158 cubic yards.

After the selected roadway borrow is placed, the next layer is a "crushed rock base course," which will be referred to as the base course. The plans called for placing a crushed stone base course on top of the selected roadway borrow to a depth, loose measurement, of four inches. The estimated amount of base course material, shown by the plans, was 20,990 cubic yards. The state allowed and paid for 20,725 cubic yards. The trial court allowed an additional amount of 12,320 cubic yards.

The next material used in this construction is "filler," which on this job consisted of earth material, thinly spread and mixed with the base course to act as a binder. The plans estimated 5,140 cubic yards of this material. The state allowed and paid for 3,225 cubic yards, and the court allowed an additional amount of 1,915 cubic yards.

The final course to be placed on the roadway, in so far as respondent was concerned, was a crushed stone top course surfacing. This top course was also of

crushed rock, and was to be spread three inches thick, to a point nine feet each side of the center line of the highway, then tapering from three inches to nothing at the shoulder. The estimated amount of this material, as shown by the plans, was 12,440 cubic yards. The state allowed and paid for 12,350 cubic yards, and the trial court allowed an additional amount of 11,158 cubic yards.

It will thus be seen that the trial court allowed additional quantities of base and top courses of more than seventy per cent of the original estimates, as shown by the plans and specifications.

Records were made and kept by the state as this work progressed, and these records we believe to be in accord with the allowances made by the state to respondent under the contract. Respondent contends these records were not kept in conformity with the quantities actually going on the road, or the measurements of the road as actually constructed, but rather were arbitrarily kept upon the basis of a theoretical road built strictly according to the plans and specifications. If respondent has established that more material than was estimated and paid for by the state was in fact required and placed on this road, then there is merit in this contention. Certainly the state's records, kept by its engineers during the progress of the work, will not be presumed to be inaccurate merely because the engineers for the state kept within the original estimates the quantities used.

This road was planned for a top width of thirty feet. Respondent claims it was constructed to a minimum top width of 34.66 feet. However, respondent accepted a width of 33.9 feet, and based its computations thereon. The plans show there was to be placed on the selected roadway borrow four inches of base course and three inches, feathered, of top course sur-

facing. Respondent contends that there was, in fact, placed an extra three-fourths inch of top course and three-fourths inch of base course, over the full width of 33.9 feet. We have checked the mathematical computations made by respondent's witnesses. If it is in fact true that respondent did build a road to an excess top width of 3.9 feet, and lay top and base course materials thereon to an extra depth of one and one-half inches, and if it is true that that roadway otherwise conformed to the plans, then respondent is entitled to recovery for additional top and base course materials, and for additional roadway borrow, required by the excess width.

Respondent has produced no records of any kind kept by it during the course of construction, to show the quantities of materials actually used. It relies principally upon its contentions that appellant's records, the only records kept, are incompetent because inaccurate, and that, by subsequent examination of the completed highway, it has affirmatively shown the actual quantities of materials used thereon.

To sustain its contention relative to excess width and depth of materials, respondent relies upon measurements of the completed roadway made at various times, from several months to nearly two years after the job was completed, viz., April, 1938, November, 1938, and May, 1939. The job was completed July 21, 1937. There were no measurements made by respondent during or immediately following the performance of the contract, but respondent contends that the road, when measured, was substantially the same as to width and thickness as when construction was completed. It may be noted here that it does not appear that respondent ever complained of any additional width or depth of materials during the progress of the work, or after it was completed, until about the time this action

was commenced, respondent's contention at the time of the controversy over estimate No. 8 being as to classification of materials.

Appellant contends that the measurements made by respondent's witnesses are not accurate, and further that, even if the measurements as taken were in themselves accurate, they do not establish the fact that respondent, at the time of construction, was required to or did put into the road any materials for which it has not been fully paid. It is appellant's position that intervening factors are responsible for the widening of the surface of the road and deepening of the materials thereon, specifically compaction, changed slopes, raveling of materials, and operations of a subsequent contractor, and that respondent's measurements, made after these events had occurred, cannot reflect the true condition of the road at the time of its construction, nor the amounts of materials then placed thereon.

This branch of the case reduces itself to the question of whether or not respondent's measurements of the roadway establish the quantities for which recovery is sought. The burden, of course, is on respondent to prove its measurements and their accuracy, and that these measurements reflect the true amounts of materials actually used in construction, for which recovery is sought.

In analyzing the evidence to see whether or not it preponderates against the findings of the trial court, evidence relative to width will be discussed separately from evidence relative to depth. We shall first consider whether the highway was staked and constructed to an excess width. During this discussion, we shall assume that the depth of materials agreed with the plans and the allowances made by the state.

Arguing that the roadway was erroneously staked for a minimum width of 33.9 feet across the top, instead

of thirty feet, respondent contends that there was in effect a rectangular core of additional material of a measured depth and 3.9 feet wide, running down the middle of the highway for the full twelve miles of its length; that respondent has not been paid for this material, and is therefore entitled to recover in this action. Appellant contends that the road was properly staked for a top width of thirty feet, as planned, and was constructed strictly according to the stakes. It is admitted that the roadway, in October, 1938, averaged 33.9 feet wide across the top surface.

From this width, together with certain general testimony relative to staking and slopes, respondent concludes that each of the layers of material put upon the graded grade was placed to an average additional width of 3.9 feet. Computation of the additional materials claimed is based on this conclusion. No independent measurements were introduced, giving the width of the base course. Only seven measurements were made as to width at the shoulders of the selected roadway borrow, and it does not appear that these measurements were used in any way in respondent's computations. Very little evidence, other than measurements of width and depth of materials, was introduced to support respondent's claim. This other evidence will be discussed later.

It is of the utmost importance, in our opinion, to the outcome of this case, to determine whether the road was or was not staked and constructed, from the graded grade up to the surface of the top course, to a planned top width of 33.9 feet. If it was not so staked and constructed, then, because of the slopes at the side of the roadway, and other factors to be presently discussed, the fact that the top is 3.9 feet wider on the surface than planned cannot be used to establish that there is an excess width of 3.9 feet of top course, base course

and filler, or selected roadway borrow, and computations of quantities of these materials, which are based upon an excess width of 3.9 feet for each layer, are necessarily erroneous, and do not reflect the true quantities used in construction.

We are of the opinion the evidence clearly preponderates against respondent on this claim that the road was staked and constructed to an excess width of 3.9 feet. Mr. Rider, the resident engineer in charge of construction, testified that he had staked the road strictly according to the plans. Three other expert witnesses for appellant, Mr. Smith, Mr. Duffy, and Mr. Harvey, after making a thorough examination of the road, testified without reservation to the correctness of Mr. Rider's staking for a thirty foot roadway. Mr. Romano testified that he built the road in exact accordance with the stakes, blue tops, slope stakes, and blue top offset stakes. Witnesses for the state, at the time of their examination, found 147 of the original blue tops, slope, and blue top offset stakes. The distance was carefully measured to each of these stakes from the center line, and found to be either exactly at, or within a fractional distance from, the location called for by the resident engineer's field notes and Romano's own record book. It was not shown that the location of these stakes, as called for by the field notes and Romano's record book, was other than in strict conformity with the plans and specifications.

The blue top stakes had been set under the supervision of the resident engineer, at the shoulders of the graded grade. They were set at such distance from the center line as would be required for a theoretical top width of thirty feet, allowing for the planned slopes of one and one-half to one, to four to one, for the ten to thirteen inches of loose materials which were to be placed on the graded grade.

It may be noted that, according to actual measurements confirmed by the field notes, a number of blue top stakes were set at points 16.4 feet from the center line. Where the slope is one and one-half to one, and only six inches of selected roadway borrow is called for, this is the correct location of blue tops, set in the manner Rider adopted, for a planned thirty foot road across the top surface. But under no theory could this setting of the stakes be reconciled with respondent's claim that the roadway had been staked for 33.9 feet across the top. Ditch stakes were also found, so located as to indicate that the side ditches were constructed in place according to the plans, not two feet further from the center line on each side, as would be required for a thirty-four foot roadway. Several of respondent's witnesses testified that, according to some twenty construction stakes which they had measured, the road was staked for thirty-four feet. None of the expert witnesses testifying for respondent knew the purpose for which the different stakes were set, other than as assumed by them from the location in which they claimed they found the stakes, or as at least one of the witnesses claimed he was told by Mr. Romano. We think it is apparent that, if the stakes were placed for the purposes assumed by respondent's witnesses, this road was not consistently staked for a finished surface of any particular width, and certainly it does not appear that it was staked for a thirty-four foot roadway.

It is quite significant that respondent introduced testimony as to only about twenty of the then existing 147 stakes, especially as the actual stake measurements would have been the best available evidence on whether the road was staked in accordance with the plans, or for a road thirty-four feet wide.

 Respondent's claims for recovery are based

upon a road staked and constructed to 33.9 feet of top width. The burden of proving that it was so staked, or that it was staked for any particular width greater than thirty feet, rests upon respondent. In our opinion, respondent has failed to introduce any convincing evidence to answer the positive evidence of appellant, that the road was staked for thirty feet. We are firmly convinced that, when all the record is considered, the evidence clearly preponderates against finding of fact No. 7, made by the trial court, to the effect that the road was staked for an actual width of thirty-four feet, and that it supports the contention of appellant that the road was correctly staked for a thirty-foot roadway. In addition to offering clear, convincing, and preponderating proof that the road was properly staked according to the plans, appellant has, in our opinion, satisfactorily explained how this road, staked for thirty feet, was in fact constructed to an actual surface width of 33.9 feet, without that construction requiring that each layer of material be spread 3.9 feet wider than the plans called for and that more material be laid than was estimated and paid for.

The thirty foot top width was a theoretical measurement, as shown by the cross section diagrams in the plans and specifications. Several factors entered into the construction of the completed roadway, which affected its width as subsequently measured. The draftsman's cross section was based on loose measurements of the roadway materials. When compacted in construction, the surface was lowered so as to intersect the theoretical inside slopes at a point nearer to the graded grade than shown by the draftsman's cross sections. According to the plans, the inside slopes averaged three to one, so for every inch of downward compaction, the surface of the roadway would be

widened three inches on each side of the center line, or a total of six inches.

The testimony is conflicting as to the amount of compaction, but taking the respondent's figure, which is that adopted by the trial court, the ratio of compaction is two to three. Assuming that from ten to thirteen inches of loose material was placed on the graded grade, as called for by the plans, compaction could increase the top width by twenty to twenty-six inches; that is to say, if you have ten inches of loose material, and you allow one-third for compaction, you would have a compacted depth of six and two-thirds inches, or in other words, the top would be three and one-third inches lower after compaction, and on a three to one slope, for every inch your material was compacted, it would widen the top three inches, so that in lowering the top three and one-third inches, you would widen the top ten inches on each side of the center line, or twenty inches in all, and by the same process, if you had thirteen inches of loose material to start with, your top surface would be increased twenty-six inches in width. Further widening effect could be caused by altering the inside slopes of the road in the course of construction.

The average slope from the shoulders of the road surface to the bottom of the side ditches was planned for slightly more than three to one. If during the course of construction the average slope from the shoulder of the graded grade, which is the base upon which the selected roadway borrow, base, and top courses were placed, to the shoulders of the completed road was altered so as to be more nearly one and one-half to one, this would necessarily produce a wider top than called for in the plans; wider by from several inches up to three or more feet, depending upon the

actual alteration in slope and the compacted depth of material placed on the graded grade.

The testimony is in conflict as to just how much, if any, these slopes differ in the completed road from those called for by the plans. Romano, Cryderman, and Gott, the last two being expert witnesses for respondent, testified generally that the slopes were constructed according to specifications, or that they appeared to conform to the proper building of the road.

W. C. Morse and M. O. Sylliaasen, witnesses for respondent, testified that the inside slopes of the road as constructed conformed very closely to one and one-half to one. Mr. Duffy, a witness for appellant, testified that, in the cut sections below or towards the ditch line, the slopes generally were four to one, towards the top of the surfacing the slopes were generally one and one-half to one, and in fill sections the slopes were generally one and one-half to one and one and three-quarters to one. Mr. Zuehlke, a witness for appellant, testified that material pushed over the shoulder would assume a slope of about one and one-half to one, and that in this case that is the position the materials assumed.

Mr. Rider, the engineer in charge of this work, stated that the materials pushed over the shoulder would take a slope of around one and one-half to one. Mr. Harvey, testifying for appellant, stated that there were stretches of the road with four to one slopes and three to one slopes, and that the highest fills were one and one-half to one. The substance of appellant's testimony on this matter is that, while the slopes from the shoulder of the graded grade to the bottom of the ditch conform generally with the plans, the slopes above the graded grade to the top of the road have been steepened, or, in other words, instead of being

three to one or four to one, they have become generally one and one-half to one.

As we have stated, Mr. Morse testified that the slopes of one and one-half to one extended from the surface of the road to the bottom of the ditch. This testimony is corroborated, in so far as it deals with the slope immediately below the shoulders of the road, but is not corroborated in so far as it applies to the one and one-half to one slopes extending to the bottom of the ditches. The elevation at the bottom of the ditches is roughly three feet lower than that at the surface of the road. If the average slope for this incline were changed from three to one to one and one-half to one, the ultimate effect would be to increase the road width by nine feet. There is no evidence of any such increase, nor is there competent evidence that the graded grade was wider or the slopes thereof different from those called for in the plans. In view of the evidence that materials pushed to the shoulders of the road would tend to assume a natural angle of repose of about one and one-half to one; that, according to the testimony, few, if any, finishing stakes were set above the graded grade for an accurate shoulder line of the materials placed thereon, the contractor merely being required by the engineer to bring the materials to a reasonably smooth and uniform surface, and to build up shoulders which were presentable, though not strictly in accord with the plans; that a large amount of crushed rock was spread along the sides of the slopes; and that the only testimony relative to existing slopes of the selected roadway borrow was by a witness for respondent, who stated the slope was almost the same as the rock slopes above it, about one and one-half to one; it would seem that appellant's witnesses have ample corroboration of their testimony that the slopes were in fact about one and one-half to one, immediately

below the shoulder of the finished road. This evidence is met only by some general statements to the contrary made by witnesses for respondent, who did not claim to have measured or even carefully examined these slopes.

It is apparent that the sharpening of these slopes, though it substantially increases the top width, has a lesser effect on the width of each layer of material lying closer to the graded grade, and no effect at the base. Respondent's computations of amounts for recovery for additional borrow, base, and top courses, and filler, rest upon the unproved premise that, the top having been widened by 3.9 feet, the lower materials have been widened to the same extent. This premise assumes that the slopes remained an average of three to one from the graded grade to the shoulders of the surfacing materials. Only by entirely ignoring the testimony of W. C. Morse, Zuehlke, Duffy, and Rider, and by assigning to the general statements of Romano, Cryderman, and Gott the weight to which specific testimony as to slopes, by witnesses who had measured these slopes, would be entitled, can respondent claim to have discharged its burden of proof relative to this step in its computation of quantities. This would certainly be a strained and unjustifiable construction of the evidence.

Appellant further contends that the road was widened an indeterminate amount by the natural spreading out of materials during the course of construction; that is, that the selected roadway borrow and base courses each have a tendency to ravel out to the sides when being worked over by blading equipment and driven over by traffic. The effect of this is to widen the roadway to a certain extent, and to sharpen the slopes of each layer of material as it is put on. Testimony as to this raveling was uncontradicted.

Appellant offers a further reason why the width of the highway was increased 3.9 feet without requiring the placement of excess materials thereon. After the completion of respondent's work under contract No. 2215, a twenty foot mat of asphaltic concrete was laid on the road surface by a different contractor. We shall refer to this work as the Compton contract, the work having been done by G. D. Lyons & Co. and J. C. Compton. Appellant contends that, during the course of this subsequent operation, the roadway surface was further widened by blading a certain amount of the Romano surface materials to and over the shoulders, thereby destroying the original shoulder lines, and making in effect new shoulders at a point further removed from the center line.

Respondent claims the oil mat was placed directly on top of the surface as it existed at the time respondent completed the work under its contract; that none of respondent's materials had been bladed to the sides; and that Compton's work in no way affected the width of the roadway.

The question of whether or not this top course was bladed out is one of the vital issues in this case, as it affects not only the question of width of the roadway, but also the contentions as to excess depth of materials. We shall later take up the question of depth of materials; our present concern is only with width.

Appellant introduced testimony to the effect that a considerable amount of Romano top course material had been bladed out from the center of the road for a width of about twenty-three feet, and windrowed along the shoulders. The explanation given for this procedure was that it was necessary to tight blade this material in order to get a firm, compacted floor upon which to lay the oil mat, respondent's material having been placed upon the road only a week or so before the

oil mat was laid, and being very loose and uncompacted, because it had not been rolled.

Mr. Fred Zuehlke was appellant's engineer in charge of the oiling under the Compton contract. As such, he was constantly present during the entire performance of that contract, and was familiar with the manner of its performance. He testified in detail as to just how the road was prepared and the oil mat laid by Compton. According to his testimony, from an area of from eleven and one-half to twelve feet on each side of the center line, there was tight bladed approximately two inches of loose top material, which was placed in mounds on each side of the road. A firm surface was thus obtained on which the oil mat was then laid to a compacted depth of two and one-half inches. Sometime prior to completion of the Compton contract, the windrows of material on the shoulders, except a very small part thereof used in constructing the oil mat, was spread from the edge of the oil mat out to and over the shoulders. This material was worked by a machine moving not more than four miles per hour, and using a boot attached to the end of the mole board in such a fashion as not to throw the material down the slope, but rather to lay it thereon, allowing it to assume its natural position of repose, of about one and one-half to one. When this operation was completed, the material at the sides of the oil mat was left slightly higher than the top of the macadam, so as to compensate for subsequent settling. The sides were then rolled with a ten ton roller, from the edge of the macadam to the shoulder lines, and thereafter about sixteen hundred cubic yards of new shoulder material was added by Compton, to bring up to grade any hollows which had developed when soft spots were rolled.

There was introduced as plaintiff's exhibit No. 11, the final record notes of the Compton contract. In addition to other matter, this exhibit contained eleven photographs taken during the course of construction under the Compton contract, each of which shows distinct windrows of material thrown up along the shoulders of the road. The only explanation offered, and we think the only explanation possible, of what produced these mounds, is the testimony given by Mr. Zuehlke, that they were scraped into that position by Compton from the surface material placed on the road by respondent.

Mr. Rider, the resident engineer in charge of respondent's work, had no direct relation to the performance of the Compton contract, but, because the two contracts were executed simultaneously in part, the Compton work having been commenced at one end of the road before respondent's work was completed at the other end, Rider was in a position to observe the manner in which the Compton work was performed. He testified, as had Mr. Zuehlke, that part of respondent's top course had been bladed into windrows, and then spread to and over the shoulders.

There was testimony by several witnesses, not contradicted, to the effect that an excessive amount of crushed rock had been deposited along the slopes of the road and down the embankments into the ditches. The amount thus pushed over the sides was variously estimated at from one to two or more thousand yards.

To refute this evidence of the manner in which the Compton contract was performed, respondent introduced the testimony of three witnesses, Romano, Gott, and W. C. Morse. Of these witnesses, only Romano was present during the performance of the Compton contract, and he was present for only a part of that performance, and then only in the same way that Rider

was present, because working on the other end of the road.

Romano testified positively that Compton had bladed material in toward the center from both sides, in order to make the crown upon which the oil mat was placed, and had not placed any new material of any kind upon the shoulders, or bladed any material from the center to the shoulders. It is impossible for us to accept Romano's version of the manner in which the Compton oil mat was laid, in the face of the testimony of Mr. Zuehlke, who was in charge of the Compton work for the state, and in view of Mr. Rider's testimony and the physical facts as shown by the photographs taken during the progress of the Compton contract.

We are of the opinion Mr. Gott's testimony in no way tends to corroborate Mr. Romano, it being only to the effect that the roadway, when seen by him, did not give the appearance, in so far as the oil mat was concerned, of having been laid as testified to by Mr. Zuehlke. It does not appear therein that it is possible, from a visual inspection of a completed road, to determine the manner in which an oil mat was laid.

Neither do we think the testimony of Mr. Morse can be said to corroborate the testimony of Mr. Romano. Mr. Morse, on direct examination, testified to the effect that the macadam was laid on top of the existing surface. His conclusion was formed only by studying the oil mat, in connection with the plans and specifications of the Compton contract. It appears from his cross-examination that his conclusion was based upon an erroneous assumption that Compton had been required to blade compacted material and that the contract price allowed for this blading was insufficient to sustain Zuehlke's testimony that two inches of the Romano top course was bladed out to the shoulders. The material bladed by Compton was loose,

rather than compacted, material, and Mr. Morse admitted that the price allowed was about right for the removal of loose material. This admission we think negatives the effect of his direct testimony.

We are of the opinion that the only conclusion warranted by the evidence is that part of Romano's top course material was bladed from the center to the shoulders of the road by Compton.

Appellant contends that, when this material was bladed out to and over the shoulders of the road, the effect was to widen the road about one foot on each side. Respondent contends that, even though this material was bladed out by Compton, it could not have widened the road.

The testimony of several of respondent's witnesses is to the effect that the selected roadway borrow could be uncovered by scraping off about three inches of loose material at a point about one foot down the slope from the shoulders of the road. This evidence is uncontradicted, and must be accepted as fact. From this physical fact, respondent concludes that appellant is in error in its theories, both as to widening in construction and widening by compaction.

It may first be observed that this testimony itself clearly establishes that the road was probably widened about six inches either by Compton or respondent. One or the other had pushed three inches of crushed rock over each side, which sloped up to form new shoulders. Since appellant's theory of widening in the course of construction involved a combination of factors—raveling of borrow and other materials, changing of slopes, and compaction—it cannot be said that testimony of this physical fact conclusively, or even probably, rebuts appellant's theory. It would, it seems to us, depend upon the combined action of these three factors, as to how deeply the select roadway

borrow would be covered at the sides by crushed rock pushed over the shoulders and down the slopes. The respondent's evidence and contentions based thereon go no further than to demonstrate that if the materials had been built to an average slope of three to one, had not raveled at the base, and had remained at the planned compacted depth, then a covering on the slopes of only three inches of crushed rock would rebut any claim that the road had been widened two feet on either side.

After considering all the evidence relative to whether the road was staked and constructed to an average width of 33.9 feet, we are convinced that the evidence preponderates against the finding of the trial court. Respondent, having failed to establish this fact, cannot use the width measurement of the surface of the road, as it was found to exist at some time subsequent to the completion of construction, as the foundation of its computations of quantities which it claimed were actually placed on the road at the time of construction.

Appellant has satisfactorily established the fact that the road was correctly staked for a theoretical top width of thirty feet, and was constructed in reasonable accordance with the staking. It has been established that the top or surface of the road measures 33.9 feet wide. No independent evidence establishes the actual width of the selected roadway borrow, base course, or bottom of top course. On the evidence introduced, it is impossible to conclude that there is an excess width of 3.9 feet for each of these materials.

Respondent did not introduce any computations based on alternative widths, nor has it undertaken to prove any excess width factor other than 3.9 feet. On this record, even assuming, *arguendo,* that there has been some over width in construction as to each of the four materials for which additional recovery is sought,

nevertheless, in so far as recovery is predicated on excess width, it must be denied because of the uncertainty and lack of proof as to what the proper width factor is.

■ It should be kept in mind that respondent's computations are based upon an additional width of 3.9 feet for each layer of material, and as to top and base courses an additional thickness of one and one-half inches over the whole road. The effect of this as to top and base courses is that respondent must affirmatively establish the measurements for both the width and depth, and, of course, prove that those measurements reflect the quantities actually used in the road at the time of its construction. To prove that the road was built to an excess width, without proving affirmatively the depth to which materials were placed on the road, is not to prove a case for one-half of the recovery sought; it proves nothing, and would, in our opinion, completely fail to disprove the correctness of the allowances made to respondent for work performed under the contract.

Several of respondent's witnesses measured the depth of materials, as found on the road subsequent to the completion of the Romano and Compton contracts. Depth measurements were taken to establish the total thickness of all materials—selected roadway borrow, base course, and top course—and to establish the combined thickness of the top and base courses. These latter measurements, of which there were only thirteen, were made at a point about twelve feet out from the center line, and the former at various points, including right at the edge of the oil mat. No separate measurements were made of the thickness of the borrow or of material under the oil mat. According to these measurements, the average compacted depth of top course and base course combined was 5.44 inches.

Witnesses for appellant testified that the compacted depth of the two materials was less than four inches. The trial court must have concluded that the respondent's measurements were the more accurate, and therefore granted recovery for amounts in close harmony with those established by respondent's witnesses, computations based upon a compacted depth of 5.44 inches. It cannot be said that the evidence preponderates against the conclusion that this material averaged 5.44 inches thick, at the points measured.

Applying respondent's compaction fraction of two-thirds, witnesses for respondent calculated that there had been placed excess top and base courses to a depth of at least one and one-half inches. (Respondent, in its brief, repeatedly refers to an *excess* of five and one-half inches, of which it says only three inches were used in computations. However, according to the testimony, the total compacted depth was only 5.44 inches, the excess was from one and one-half to two inches, and the factor used by respondent's witnesses in computations was one and one-half inches.) This excess of of one and one-half inches of surfacing materials was then allotted equally between the top and base course. It is not entirely clear whether this division was on the basis of one-half of the excess to each course, or on the basis of three-sevenths for the top course and four-sevenths for the base course. Totals were arrived at by multiplying the measured width by the measured depth for the total distance of twelve miles.

Even if we take as an established fact that the surfacing materials were compacted to a depth of 5.44 inches on the shoulders, and that the proper compaction fraction is two-thirds, it is still impossible, in our opinion, to accept respondent's computations based thereon. Even when adjusted for compaction, such measurements made after completion of the Compton

contract cannot truly reflect the depth to which surfacing materials were originally laid by respondent.

In discussing the Compton work, it was pointed out that the evidence clearly establishes certain facts in reference thereto; namely, that Compton had bladed a portion of respondent's materials from the center to the shoulders of the road before laying the oil mat; that this material was later spread out and rolled so that the sides of the roadway followed the same contour as the macadam; and that Compton had added 1,600 cubic yards of shoulder material to level up the hollows produced by the rolling. The effect of these operations was to increase the thickness of crushed rock on the sides, and to decrease its thickness under the macadam. Of course, it could not affect the total quantity of material which respondent had previously laid on the roadway.

Respondent's measurements were taken through and including this extra material which Compton had bladed to or placed on the shoulders. The depth factor thus acquired was multiplied by the total width, to determine quantities. No allowance was made for the 14,800 cubic yards of crushed stone put on by Compton, and included in the oil mat which was sunk into the road as completed by Romano. Nor was the total thickness of 5.44 inches adjusted in any manner to allow for that portion of it which was directly caused by Compton's blading and his addition of 1,600 cubic yards to the shoulders. Respondent's theory is that the macadam was placed directly on top of the surface as completed by respondent, and that Compton added no additional shoulder materials. Were it true that the road was thus constructed, then respondent's measurements of the depth on the shoulders, adjusted for compaction, would be an accurate basis for computing quantities. Finding, as we have, that Compton did

not lay the oil mat in this manner, we must necessarily conclude that the basis of respondent's computations is inaccurate and incompetent, as in no way reflecting the depth to which surfacing materials were originally placed. We are of the opinion the depth measurements adopted by respondent were so demonstratively inaccurate and unreliable that no recovery could be allowed in this action based upon respondent's computations, even if respondent had sustained the burden of proof relative to the road's having been staked and constructed to an excess width.

May we at this point make this general observation relative to the depth measurements taken by respondent's witnesses? Thirteen depth measurements were taken over this twelve miles of road, and the measurement thus obtained was used as one of the factors in making the computations upon which the judgment in this case was based. From an engineering standpoint, this may have been a proper method of arriving at the average depth, but it seems to us this fact in itself would raise grave doubts in the mind of the average person as to the sufficiency of such testimony to establish the contention of respondent, and to overcome the records made by the state and the oral testimony of appellant introduced at the trial.

We think also the evidence quite clearly establishes that whatever excess width there may in fact have been for each layer of material was fully compensated for by a decrease in the depth of materials. We are firmly convinced that respondent has failed to establish the competence of either its measurements of width or of depth, as a means of ascertaining what quantities were originally put on the road, and that, in so far as recovery was based on computations resting on these measurements, the judgment of the trial court must be reversed.

■ While, as we have stated, respondent's case for recovery of additional material rests principally upon its evidence concerning measurements of width and thickness of the finished roadway, other evidence was introduced by respondent to show, either independently or in conjunction with its measurements, that additional materials were in fact used in construction. We shall now discuss this evidence.

The trial court allowed respondent $1,149, for 1,915 additional cubic yards of filler. Filler, as hereinbefore explained, is fine earth material added to and mixed with the base course as a binder. The original estimate of the quantity of filler was 5,140 cubic yards, or about 430 cubic yards per mile. The 5,140 cubic yards was but an estimate, subject to an increase or decrease, as required by the resident engineer during the course of construction, the unit bid price to be paid for the actual quantities used. Respondent's claim for additional filler is made on the assumption that additional base course was used in construction, and that therefore additional filler was required.

Respondent's witnesses all admit that they could not calculate the amount of filler actually used, but simply estimated it on the basis of the assumed quantity of base course. The claimed 1,915 cubic yards added was arrived at by taking the difference between the original estimate of filler and the amount of filler actually allowed and paid for by the state. Witnesses for both respondent and appellant testified that the quantity of filler is subject to variation, depending upon the particular condition of the base course and roadway upon which it is being used. Mr. Rider testified that he held the amount of filler on this job to the absolute minimum. Mr. Claypool, the district construction engineer testified that it is the policy of the highway department to use a minimum of filler in this

kind of construction. Mr. L. Romano testified on direct examination that, at Mr. Rider's request, he put on only 265 cubic yards of filler per mile, instead of the 430 called for in the plans.

A book of original entry, containing appellant's records of quantities actually placed on the road, was introduced by appellant. This book, which we shall designate as "surfacing book," contained entries made daily therein by Mr. Brown, inspector for appellant, while on the job, and these entries are in his handwriting. Mr. Brown's duties on this job were to inspect the quality of crushed rock used in the surfacing material, and to see that it was distributed in proper quantities on the road, and further to see that it was processed and bladed in the proper manner to finish the road, and to keep records of the actual quantities of material going on the road. Mr. Brown's book shows, with slight variations, that 265 cubic yards of filler was placed per mile, and that the total for the twelve miles was 3,225 cubic yards, the amount allowed by the state and paid for.

Again we desire to call attention to the character of the testimony of respondent's witnesses relative to filler. These witnesses admitted they did not know and could not tell the actual amount of filler used on the job, but, having determined that there was more base course used than allowed for by the state, they testified there must have been more filler used than allowed by the state, so they arbitrarily took the difference between the amount as shown by the original estimate and the amount allowed by the state, which was 1,915 cubic yards, and this was the additional amount of filler allowed by the trial court.

In view of the positive character of both the oral and documentary evidence of the state on this question, the admission of Mr. Romano, and the conjectural na-

ture of the computations of respondent's other witnesses, we are of the opinion that the trial court's allowance of 1,915 additional cubic yards of filler was not supported by the evidence, and the claim must be disallowed.

Respondent has introduced no evidence, in addition to its measurements of width and depth of materials, to sustain the trial court's allowance of $13,947.50 for 11,158 cubic yards of additional top course surfacing. On the other hand, appellant has introduced evidence that is almost conclusive in corroborating the final allowance which the state made to respondent on its estimates Nos. 8 and 9. This testimony has to do with appellant's method of measuring the quantities of top surfacing material, which material was to be paid for in place on the roadway.

Mr. Brown testified that, based upon the mathematical result of dividing the length of the road by the total estimated quantity, spread stakes were set ninety-five feet apart on most of this job. Between these stakes, the top course was spread four trucks wide. Each truck carried five cubic yards. This testimony is corroborated by the surfacing book, containing the daily entries of quantities made while the job was in progress; by the testimony of one Phillips, blade man for respondent on the job, who testified that spread stakes were set and that the top course did not appear to be more than three inches deep; by Romano's testimony that spread stakes were set; and by Rider's testimony. It is refuted only by implication that, accepting respondent's contention that the road was constructed wider and thicker than planned, more top material was placed than the spread stakes and appellant's records indicate.

Computing the quantity called for by these spread stakes, and comparing that with the allowances actually

made, appellant's evidence in this regard seems not only to refute respondent's claim for 11,158 additional cubic yards of top course, but also to establish conclusively, on this record, the correctness of the item of 12,350 cubic yards for top course allowed in appellant's estimates Nos. 8 and 9. We are clearly of the opinion that the evidence preponderates against the findings of the trial court on this item, and that respondent is not entitled to recover $13,947.50, or any part thereof, for additional top course.

The trial court allowed respondent for an additional 12,326 cubic yards of base course surfacing. In regard to this class of material, respondent has introduced evidence in addition to computations based on width and depth measurements. This additional evidence consists of testimony of Mr. Romano to the effect that he had crushed something in the neighborhood of 35,000 cubic yards of base course material, in order to get enough material to cover the road, whereas, had the plans been followed, 21,000 cubic yards would have been a sufficient quantity. Of this 35,000 cubic yards, he testified that 23,000 had been crushed and placed in a stock pile, and that, this proving to be an insufficient quantity, 11,000 or 12,000 yards more had to be crushed to complete the job. Romano testified he had cross sectioned the stock pile with a steel tape, that he was experienced in taking such measurements, and that his results had a high degree of accuracy.

By the terms of the contract, base course materials were to be paid for in the same manner as top course surfacing, according to quantities computed from the truck loads delivered on the roadway. Romano claims that the engineer should have either measured his stock pile or given rock tickets as receipts for the truck loads delivered therefrom. Appellant having failed to do either, it is contended that appellant must accept

Romano's estimate of the quantity in the stock pile, and make payment in accordance with this estimate. We are unable to agree with this contention. The specifications require neither measurements of stock piles nor the giving of rock tickets. Granting that one or the other of these systems should have been adopted, in complete fairness to the contractor, it nevertheless does not follow that the system of setting spread stakes and keeping tallies of truck loads delivered on the road is not an entirely accurate means of ascertaining quantities, and furthermore, in using spread stakes, the contractor is afforded ample protection, as he can at any time determine the amount of material being placed on the roadway, by simply measuring the spread between the stakes. It has been the custom in highway district No. 6, where this road was constructed, to use spread stakes and not rock tickets. This system avoids the necessity of having an extra man for each shift, and has led to no previous complaints. Appellant's calculations of quantities are based upon this method, and nothing appears in the record to directly impeach the accuracy of the system.

Even if it be conceded that the state's records contain some inaccuracies, it still rests with respondent, in order to recover in this action, to affirmatively establish quantities in lieu of those shown by appellant's records.

It is apparent from the findings of fact and from the recovery allowed for base course, that the trial court calculated that recovery by some computation based on the finding that the road was staked and constructed to a particular excess width and depth. Recovery was not allowed on the basis of Romano's testimony that respondent had crushed about 35,000 cubic yards of base course material. Nor did the trial court make any express finding concerning this testimony. Additional

recovery was allowed by the trial court in very exact figures, 12,326 cubic yards. It must be assumed, therefore, that the trial court could only have treated this testimony as merely corroborating the evidence relating to width and thickness.

Having determined that measurements of width and thickness are incompetent for calculating recovery, we then face the question of whether this independent evidence as to the amount of base course claimed by Romano to have been crushed will support any recovery, and if so, how much.

Considering first the testimony of Romano that there were 23,000 cubic yards of base course in the stock pile which he had crushed, it appears that this figure was based upon steel tape cross section measurements of the stock pile, which Romano claimed to have made. The measurements themselves were not testified to. Romano said that his estimate of quantity based upon such measurements was within five per cent of accuracy. No one else measured this stock pile, or computed the quantity of its contents. It does not appear that Romano had the elevations of the ground surface, upon which the pile rested, to work from; without these, it seems to us, an accurate estimate is impossible. Mr. Rider estimated the quantity at around 17,000 cubic yards. He also testified that Romano's method of cross sectioning contained a twenty-five per cent margin of error, because of the great size and peculiar shape of the pile. Romano had told Rider, at the time he cross sectioned the pile, that there was about 21,000 cubic yards in it. Rider, at that time had noted in his personal diary that the pile appeared short of the 21,000 cubic yards estimated by Romano, and, subsequently, when the pile ran low, before the job was completed, Romano told Rider that he "guessed the night crew

had gypped him on the amounts put in the pile." Mr. Romano denied making this last statement.

Romano had requested Rider to cross section this pile, and Rider had refused to do so. At the trial, Rider explained this refusal on the ground that, at the time the request was made, he and his crew were extremely busy, and it would have required nearly a day's time for himself and a crew of three or four men to accurately cross section the pile. He gave as a further reason the fact that the pile had been erected by respondent for its own convenience, and that payment could not be based upon the quantity estimated, by cross sectioning, to be contained therein, but must be made according to truckloads at the point of delivery on the road.

As to the 12,000 cubic yards which respondent claims was crushed after the stock pile was exhausted, the evidence as to the quantity of this material consisted of multiplying Romano's estimate of the hourly production capacity of the crusher, by Romano's estimate of the number of hours the crusher was operated. On cross-examination it was brought out that these estimates were extremely loose, Romano having been present for only a part of the time during which this claimed 12,000 cubic yards was crushed, and having maintained no check whatever on the admittedly large amount of time lost due to breakdowns in the equipment.

It also appears that all of this purported 12,000 cubic yards, plus 600 cubic yards remaining in the stock pile, was put between stations 63 and 227. Appellant's records show there was also 1,380 cubic yards from the state's stock pile put on this area, but, this being denied by respondent, we shall treat it as not true. In relation to the 12,600 cubic yards, it is significant that, even if the base course had been laid to an excess

width of 4.66 feet and to an excess depth of seven-tenths of an inch, the maximum figures testified to by respondent's witnesses, still there would have been used, according to the computations of respondent's witnesses, not allowing for spot loads, only 9,340 cubic yards between stations 63 and 227, instead of 12,600; if the material were four feet wider than planned, but at its planned depth, the quantity would be only 7,416 cubic yards, according to Romano's computation. The foregoing figures demonstrate the unreliability of Romano's testimony upon which recovery is sought.

From appellant's records, it is established that, on base course, spread stakes were set fifty-six feet apart, and a tally thus kept of the truck loads delivered to the road. This record of quantities delivered was the only record required by the contract. Checked by simple computation, making allowance for spot loads, this spread of fifty-six feet agrees with the allowance made by appellant for base course, and with the original estimate of quantities. If the spread stakes were in fact set at fifty-six feet, and nothing in this record appears to the contrary, then it is mathematically impossible for Romano's testimony, either as to the 23,000 cubic yards in the stock pile or as to the 12,000 additional cubic yards, to be even approximately correct. If Romano had in fact estimated the stock pile to contain 23,000 cubic yards, which was more than the amount the plans called for to complete the road, then surely when this stock pile was nearly exhausted long before the road was completed, Romano must have been aware that an excess amount of material was being placed on the road.

It is certainly peculiar, to say the least, that at that time Romano, knowing that the state had refused to cross section his stock pile, and knowing that the contract called for payment at the point of delivery

and that the state was not furnishing rock tickets, but that its quantities were based solely on records made with reference to spread stakes and loads delivered, and that payment would be based thereon, failed to measure any of these stakes, for the reason, as stated by him, that he was not interested in their measurements. Furthermore, it is difficult to believe that Mr. Romano, with his years of experience in road construction, would not have realized and discovered that a great amount of additional material was going on this road, had such been the case, and made some complaint to the engineer. Yet it does not appear that, at any time during construction, Mr. Romano ever claimed or complained that the road was being constructed too wide, or that too much material was being placed thereon, although it now appears from the additional amounts allowed by the trial court, that over seventy per cent more top and base material went on the road than was called for by the plans. Had the road been constructed as claimed by respondent, and had the additional material now claimed been placed thereon, it appears to us there were many things which would have called this condition to the attention of an experienced contractor, and because thereof, complaint would have been made. But as we read this record, Mr. Romano never did discuss or complain about the excess width and depth, and it was only when some of his expert witnesses went over to inspect the road in 1938 that they made measurements and thus determined that the road had originally been constructed as now contended for by respondent.

We are unable to accept this independent testimony of Mr. Romano, in the face of the records kept by the state, as sufficient to justify any recovery for base course. We are again satisfied that, on the whole record, the evidence preponderates against the finding of

the trial court that respondent is entitled to $14,174.90, or any part thereof, for additional base course material.

The trial court allowed recovery of $5,958, for 11,916 additional cubic yards of selected roadway borrow. We have heretofore described this material, and stated that it is the first layer placed on the graded grade. Under the terms of the contract, this material was to have been paid for "in excavation"; that is, the quantity in cubic yards was to have been calculated by measuring the pits from whence the borrow was obtained. Accordingly, appellant's engineers cross sectioned the surface at the location of each pit before excavation commenced, and then measured the pit when excavation was completed. The total quantity of borrow placed on the roadway from each pit was thus computed, and respondent was allowed the combined total, 45,514 cubic yards, in estimates Nos. 8 and 9. No testimony was introduced by respondent concerning measurements which it may have made of the borrow pits, or computation of quantities based thereon.

Respondent's theory of recovery in this instance rests entirely upon computations of additional material required to construct a road to an excess width of 3.9 feet, with a further allowance for three inches of excess depth, between stations 158 and 227. No evidence was introduced by respondent refuting the measurements, or computations based thereon, made by appellant, of the selected roadway borrow pits. Testimony concerning other selected roadway borrow pits, from which indefinite quantities of borrow were claimed to have been excavated, was, in our opinion, entirely too vague and uncertain to permit any recovery based thereon. We have already stated our conclusion relative to respondent's width measurements, and it is sufficient to state here that this method is no more competent in

the case of selected roadway borrow than it is for the base or top course. There is no independent testimony which, in our judgment, is capable of supporting the trial court's finding that respondent is entitled to $5,958, or any part thereof, for additional selected roadway borrow.

The trial court allowed $3,041.50 for solid rock excavation, in addition to the amount allowed and paid for this item by the state. This amount was the sum of three separate items: $2,147.60 allowed but not paid for 3,068 cubic yards on estimate No. 9; $273, for 390 cubic yards of additional solid rock between stations 140 and 150; and $620.90 allowed for 887 additional cubic yards from stations 310 to 317.

The contract price for solid rock excavation was one dollar per cubic yard; for class A excavation, it was thirty cents per cubic yard. In permitting recovery for additional solid rock excavation, the trial court followed the procedure adopted by appellant in its estimate No. 9—the quantity of class A excavation was reduced to the same extent that the solid rock quantity was increased. Thus the total quantity of excavation remained constant, the only change being in the matter of classification. The compensation for this increased yardage of solid rock was computed at seventy cents per cubic yard, that being the price of solid rock excavation less the price for class A excavation. As to the $893.90 allowed for the 1,277 cubic yards from station 140 to station 150, and from station 310 to station 317, we are of the opinion the evidence does not preponderate against the finding made by the trial court, and the allowance was therefore proper.

Whether material should be classified as solid rock or class A excavation is admittedly a matter of judgment. Romano testified that, in his judgment, there was 1,277 cubic yards of solid rock excavation between

these stations. Appellant allowed none, and its witnesses testified there was none. Upon personal inspection of the premises, the trial court found solid rock physically present between those stations. Only Romano had testified as to how much there was. Upon this state of the evidence, the trial court was obviously justified in basing its allowance for 1,277 cubic yards on Romano's testimony.

As to the $2,147.60 allowed pursuant to estimate No. 9, we are of the opinion this item, too, was proper, and the trial court properly allowed it.

Appellant contends that estimate No. 8 was final, and that the additional allowance made in estimate No. 9 was but an offer to compromise a subsequent dispute between the parties, and that, as such, it cannot be used in proof of the fact that respondent is entitled to additional rock classification. Respondent, denying that estimate No. 8 was final, contends that this was not an offer to compromise, but an attempt to arrive at an agreement upon the quantities to be incorporated in the final estimate.

We are of the opinion that it is immaterial whether estimate No. 9 was or was not an offer to compromise. In either event it contains an admission of an independent fact concerning additional solid rock classification. This admission, made by appellant upon the basis of a careful resurvey by its engineers, is pertinent to the question in issue, and may be received in evidence as an admission of this fact, even though the statement was made as a part of an offer to compromise. *Ingraham v. Associated Oil Co.*, 166 Wash. 305, 6 P. (2d) 645; *Illinois Central R. Co. v. Manion*, 113 Ky. 7, 67 S. W. 40, 101 Am. St. 345; note 80 A. L. R. 919. The trial court properly allowed the $2,147.60, in accordance with estimate No. 9.

In its complaint, respondent asked for $20,-145.21, as the aggregate of the retained percentage of fifteen per cent withheld by appellant in accordance with Rem. Rev. Stat., § 10320. Acting upon order of the superior court for Thurston county, in the case of Lynch v. Romano, No. 17446, appellant paid into court $17,645.21 of this retained percentage, for the benefit of respondent. In accordance with a stipulation entered into between counsel, $2,500 of the $20,145.21 was retained by appellant. In the judgment appealed from in this case, the trial court found that this $2,500 balance of the retained percentage was still due respondent, and entered judgment therefor.

Error in regard to this finding was assigned on the ground that it is not supported by the evidence. However, in its brief, counsel for appellant frankly call the court's attention to the fact that nothing appears in the record in proof that the $2,500 had been paid, and that therefore this assignment is without merit. While counsel for respondent does not admit that this sum has been received by respondent, he intimates that the court would probably be justified in accepting the statement of counsel for appellant.

The only reference to payment of this sum is in the uncontroverted statement of counsel for appellant, to that effect. We do not feel that we can accept this statement for the purpose of holding the trial court was in error in granting judgment in favor of respondent for this amount. We must be bound by the record as made. We do not feel that the parties hereto will experience any difficulty in adjusting this matter, without recourse to further litigation.

Further error is assigned by appellant, in that the trial court erroneously admitted testimony concerning an alleged increase in the number of road ap-

proaches upon which surfacing material was placed. In view of the conclusions reached by us relative to top and base course materials, it becomes unnecessary to discuss this question.

The judgment of the trial court is reversed, in so far as it allows recovery to respondent for excess quantities of top surfacing, base course, filler, and selected roadway borrow, and affirmed as to the additional amount of solid rock, in the sum of $3,041.50, and as to the $2,500 retained percentage. The cause is remanded with instruction to the trial court to enter judgment in conformity herewith.

BEALS, BLAKE, and SIMPSON, JJ., concur.

MILLARD, J. (dissenting)—The judgment should be affirmed. I am convinced by my examination of the record before us that there was substantial evidence to support the findings of the trial court, and that the preponderance of the evidence was not clearly against those findings which sustain the judgment.

The evidence was in conflict. The trial court inspected the road. Upon a conflict in the evidence we are bound by the findings of the trial court which is in a better position than we to weigh the evidence of the several witnesses who appeared and testified.

No good purpose would be served in reviewing all of the evidence in this case. The trial court found that the road was staked for an actual width of thirty-four feet. The state's records were to the effect that the road was thirty feet wide. One of appellant's engineers testified, in the face of that record, that he widened the road in construction to thirty-two or thirty-three feet. Appellant's engineers further testified that the road was widened an additional eighteen inches on either side so that the roadway measurement from shoulder to shoulder would be 34.66 feet more or

less. The contention of appellant that the road was correctly staked for a road thirty feet wide, and that, while the actual surface width was 33.9 feet, that construction did not require that each layer of material be spread 3.9 feet wider than detailed by the plans, and that no more material was incorporated into the highway than was estimated and for which respondent was paid, is refuted by the testimony of appellant's own engineers.