[No. 36768.   Department One.   May 6, 1965.]

P. L. SADDLER, *Respondent,* v. THE STATE OF WASHINGTON, *Appellant.**

*The Attorney General* and *Edward E. Level, Assistant,* for appellant.

*Murray & Hanna,* by *Robert F. Murray,* for respondent.

*Reported in 401 P.2d 848.

HUNTER, J.—Plaintiff (respondent), P. L. Saddler, was awarded two road-construction contracts by the state of Washington, defendant (appellant): contract No. 4645 (referred to as contract No. 1), for the construction of 8 miles of secondary state highway 7-C from its junction with primary state highway No. 7, east of Vantage in Grant County toward Othello; contract No. 4784 (referred to as contract No. 2), for the continued construction of highway No. 7-C, for a distance of approximately 20¼ miles.

Separate actions were brought for the asserted breach of each contract, for the payment of work performed and not allowed by the state, and the actions were consolidated for trial in Thurston County. After a 5-week trial, tried without a jury, judgments were awarded the plaintiff in both actions.

This appeal is taken from the awards in only those causes of action that concerned payment: (1) for claimed quantities of heavy excavation, and (2) for claimed excessive requirements by employees of the state in the finishing of the subgrade.

Contract No. 1 provided for a unit price payment of 90 cents per cubic yard for the removal of solid rock. The trial court awarded an additional $11,878.30 for performance of this type of excavation. Contract No. 2 provided for a unit price of 42 cents per cubic yard for class A excavation. The trial court awarded an additional $26,517.75 for this class of excavation. For the cost of excessive finishing requirements in the completion of the subgrade, the trial court awarded $13,858.13 under contract No. 1 and $16,845.64 under contract No. 2.

The trial court also directed the state to pay the plaintiff $5,404.59, which was withheld by the state from payments due the plaintiff in lieu of a penalty in that sum assessed against the plaintiff for delay in completion of the contract.

This appeal involves a factual dispute which was resolved by the trial court after a consideration of all the evidence. There is substantial evidence in the record to support the trial court's findings. The real issue is whether the evidence considered by the trial court was properly before it in view

of standard specifications in the contracts. The state contends that the specifications are plain and unambiguous and that they expressly prohibit the consideration of evidence which was admitted over the state's continuing objection. The pertinent standard specifications in the contracts are as follows:

11-1.01. CLASSIFICATION

Solid Rock Excavation shall include all solid rock in ledges, bedded deposits and unstratified masses and conglomerate deposits so firmly cemented as to present all the characteristics of solid rock and which cannot be removed without drilling and blasting, and all boulders containing a volume of more than one-half cubic yard. All solid rock layers with an overburden of shattered rock or solid rock layers interspersed with strata of clay or similar material will be classified as "Solid Rock Excavation" for the total depth of excavation in which the solid rock strata constitute not less than 85 per cent of the total depth.

Common Excavation shall include all other material not classified as Solid Rock.

[Class A excavation shall include all solid rock encountered; cemented gravel, hard pan and caliche. Special contract provisions, exhibit No. 6.]

2.02. INTERPRETATION OF ESTIMATES

The estimate of quantities as shown on the plans or in the specifications shall be used only for comparing bids and determining the amount of the contract. The basis of payment of this contract will be the actual quantities of work performed in accordance with the plans and specifications and as specified therein for payment, and if, upon the completion of the improvement said actual quantities should show either increase or decrease from the quantities shown on the plans or in the specifications, the unit bid prices in the proposal shall still prevail, except as otherwise provided.

5.01. AUTHORITY OF ENGINEER

It is understood and agreed by and between the parties hereto that the work included in the contract is to be done under the direct supervision and to the complete satisfaction of the Director of Highways, or his duly authorized representative, and that the decision of the Director of Highways as to the true construction and meaning of the contract, plans, specifications and estimates, and as to all questions arising as to the proper performance of the work

shall be final. The Director of Highways shall determine the unit quantities and the classifications of all work done and materials furnished under the provisions of this agreement and his determination thereof shall be final and conclusive and binding upon the Contractor.

The Director of Highways shall decide any and all questions which may arise as to the quality or acceptability of materials furnished and work performed and as to rate of progress of the work, and all questions as to the acceptable fulfillment and performance of the contract on the part of the Contractor and as to compensation. His decision in such matters shall be final.

5.04. CONFORMITY WITH PLANS AND DEVIATIONS

The Contractor will be governed by such lines, grades and cross sections as may be given by the Engineer in laying out the work and by the Engineer's determination of quantities of work performed.

9.01. MEASUREMENT OF QUANTITIES

The determination of the pay quantities of work performed under the contract will be made by the Engineer based upon the lines, grades and cross sections given or measurements made by him or his assistants. In computing volumes, the method of average end areas will be used for excavation and embankment. Corrections for curvature will be made where deemed advisable by the Engineer. All items will be computed in the units in the proposal, according to well recognized engineering principles, and no local rules or customs shall govern. No allowance will be made for work done or materials placed outside of the lines indicated on the plans or ordered by the Engineer.

11.4. MEASUREMENT

All grading will be measured in excavation in its original position by cross-sectioning. Pay quantities shall be computed to the neat lines of the cross-sections as staked.

The plaintiff does not dispute the state's determination of the gross yardage of material removed by the plaintiff, as estimated by the "cross-section" method. The disagreement concerns the state's *classification* of the total yardage excavated.

It is the contention of the plaintiff that classification of the material within the gross yardage excavated involves the exercise of discretion; that the record discloses this discre-

tion was arbitrarily and capriciously exercised, and, that the plaintiff therefore was not restricted to the cross-section mode of measurement specified in the contract. Plaintiff relies on the rule as stated in *Ward v. Smith,* 140 W. Va. 791, 808, 86 S.E.2d 539 (1955), cited by the state:

> The measurement requirement of the specifications, made a part of the contract, could not be disregarded or departed from by the plaintiff without a showing by him of the *existence of some condition which constituted a legal excuse or justification for his failure to satisfy that requirement.* (Italics ours.)

As a further justification for not using the cross-section method of measurement, the plaintiff contends that he did not realize it would be necessary to do his own cross-sectioning until it was too late.

Plaintiff, in support of his contention that the classification of the gross yardage required the exercise of discretion, cites *Romano Engineering Corp. v. State,* 8 Wn.2d 670, 714, 113 P.2d 549 (1941), in which the question arose as to the classification of solid rock and class A material that had been excavated. We there said:

> Whether material should be classified as solid rock or class A excavation is admittedly a matter of judgment. Romano testified that, in his judgment, there was [sic] 1,277 cubic yards of solid rock excavation between these stations. Appellant allowed none, and its witnesses testified there was none. Upon personal inspection of the premises, the trial court found solid rock physically present between those stations. Only Romano had testified as to how much there was. Upon this state of the evidence, the trial court was obviously justified in basing its allowance for 1,277 cubic yards on Romano's testimony.

The trial court, in its oral opinion, concluded that the plaintiff was correct in his contention that the classification of the quantities measured by cross-sectioning required the exercise of discretion:

> The testimony of necessity was based *upon estimates, actually based upon estimates on both sides,* because the cross sections were not a positive thing. I think the Court

can take judicial notice of the fact that the terrain of both the surface of the ground and surface of the solid rock under the ground is not a flat table. It is rough. It is irregular. (Italics ours.)

An examination of the contract shows that specification Sec. 9.01, *supra*, states:

Corrections for curvature will be made *where deemed advisable* by the Engineer. (Italics ours.)

■ We believe that the trial court correctly held that the measuring of quantities of classifications did require the exercise of discretion. However, such exercise of discretion by the Director of Highways (or his representative) would nevertheless be binding and final upon the plaintiff under specification Sec. 5.01, *supra,* in the absence of an unreasonable and arbitrary exercise thereof. *Coyle Constr. Co. v. Skagit Cy.,* 177 Wash. 520, 32 P.2d 106 (1934); *Ward v. Smith, supra.*

It is the plaintiff's contention that the state's representatives in charge were prejudiced against the plaintiff; that they exercised their discretion arbitrarily and unfairly, and that their judgment was unreliable; further, that this was the conclusion of the trial court after a consideration of all the acts of the state's representatives in charge, as gleaned from the entire record.

■ The state argues that the trial court made no finding to this effect. The record discloses no such formal findings were made; however, we are entitled to consider the oral opinion of the trial court, since it is not inconsistent with the findings.

To comprehend fully the conclusions of the trial court in regard to the attitude of the representatives of the state and their judgment exercised in determining quantities and finishing requirements for the subgrade, it is necessary to recite the trial court's opinion at some length. The trial court stated:

After hearing the testimony and considering all of the testimony in the record the Court doesn't have *the slightest doubt* that the Plaintiff, Mr. Saddler, *moved more solid rock than he got paid for. I don't think there is a*

*shadow of a doubt of that.* The problem then arises as to determine how much.

The testimony of necessity was based upon estimates, actually based upon estimates on both sides, *because the cross sections were not a positive thing. I think the Court can take judicial notice of the fact that the terrain of both the surface of the ground and surface of the solid rock under the ground is not a flat table. It is rough. It is irregular. The engineers had to use some judgment in where they picked to take the cross sections.* The biggest problem seemed to arise in the big cut, the big open cut at Sand Hollow, and it is significant that at that point there were some cross sections taken 15 feet before grade was reached, and those cross section notes were introduced into evidence. *It is interesting to note that they were taken at irregular intervals, that one would be taken five feet to the right of the center line, the next one eight feet to the left, the next one on the center line; highly irregular.* The Court can only conclude from that that the locations where those cross sections were taken were selected for some reason, and the Court doesn't know what the reason was, *but after considering all the testimony it is certain that the locations selected for the taking of cross sections were not unfavorable to the State. As was pointed out by counsel, supposing for the sake of argument that based upon cross sections the State had determined not to pay Mr. Saddler one cent for solid rock. Certainly that could not stand.* And from there on it is a matter of degree and not of kind, and the Court believes that the Plaintiff is entitled to recover an amount on the first cause of action. The big problem is how much. The estimates of various witnesses were widely in variance, and I feel that in a case of this kind that the Plaintiff certainly is not entitled to the estimates more favorable to Plaintiff, but that the more conservative estimates must prevail.

After considering the factors the Court will find that the Plaintiff moved 243,550 cubic yards of rock. And in case counsel are searching for where that figure came from, it is based upon a factor of one pound of powder to a cubic yard of rock, which was a figure mentioned by a number of witnesses as being a conservative figure, and in view of the uncertainties of this sort of thing I feel that it is incumbent upon the Court to accept a conservative figure.

. . . .

As to the first cause of action in the second case, there was a great amount of testimony on that, and that is another point where the Court's view of the premises was of some help. The testimony of Mr. P. L. Saddler, Mr. Harry Saddler, I believe Mr. Roy Saddler testified on that also, Mr. Blakely, and several other witnesses of considerable experience placed the figure at 75 to 80 per cent caliche. Mr. Malloy said 70 per cent, and he was a man of very considerable experience who is not now connected with either of the parties; thoroughly disinterested. Then the testimony of Mr. Harris was most helpful, as to the tendency of this material to disappear after a period of time of being exposed. While Mr. Harris has been ridiculed to some extent he apparently was thoroughly familiar with the area and had a considerable educational background in matters of geology and soils engineering and had had considerable experience in the immediate area. As to his testimony concerning the character of this material, he was the only person in the entire case who ever gave a scientific description of what caliche was, and from his description it certainly is reasonable that the material would disappear after it has been broken up and worked and then exposed to water, since it is a deposit of a water soluble material which in a normal area would be carried off by the water, but in this area because of the dryness, because of the lack of water most all the time, it is permitted to settle below the surface of the soil and harden, become extremely hard and tough, and as long as it remains solid it is there, but when it is once broken up and then exposed to weather and water it has a tendency to disappear. It certainly is reasonable considering the nature of the material. Besides that. of course, there is the testimony of the State men that it would be impossible to see all of the caliche because their explanation was that dirt had sifted over the slopes and banks and covered the caliche. Well, whichever it was, the witnesses on both sides admit that there is more caliche there than the eye can see, and during the Court's view the Court saw a lot of caliche. Then the testimony of one of the State men, either Mr. Wilbanks or Mr. Therriault, was very significant. They had to keep a cable holding the tooth of the ripper up because otherwise it would dig down into the caliche and they only wanted to go to the surface of it, and that went down two feet. So except in a few areas where they had to do test hole

digging the caliche was less than two feet, obviously less than two feet, from the surface of the ground.

*The Court is convinced that there was a more substantial amount of caliche in the area than Plaintiff was paid for*, and the Court will accept the figure of Mr. Malloy of 70 per cent caliche as being the correct figure. Mr. Malloy was an experienced witness. He was foreman on the grading on a good deal of that area, was doing a certain amount of engineering work for the Plaintiff, and was there and saw the area constantly. He is a thoroughly disinterested witness, and I feel that the Court is justified in accepting the testimony of a man of Mr. Malloy's experience, and considering his opportunity to observe, his obvious ability to observe, he had reason to be observing that because he was working there, and I feel the Court is justified in accepting Mr. Malloy's testimony on that.

Now, as to the excessive finishing requirements, that is another problem. That relates both to the fourth cause in the first case and the second cause in the second case. That is one that gives the Court some trouble. Of course, *the Court does not accept, and wants to make it clear at this time the Court does not accept Defendant's theory that the contractor and his crew were incompetent, or that they didn't know how to build a road. I don't think there is anything to that.* But there is a lot to the defense theory that this was an unusually difficult piece of road to build, on the first contract due to the solid rock and on the second due to the caliche. It probably did take more time than a normal roadway would. *On the other hand, I feel that the Resident Engineer was quite particular about that for some reason. One possible reason could be that—as was alluded to at various places throughout the testimony—that there had been trouble some place in the State with a section of roadway, and the Resident Engineer apparently was trying to protect himself, protect his job, and be sure there wasn't any trouble on the roadway that he built. That could have been one reason. There may have been other reasons. But Mr. Wilbanks was the man that was on the job there. His testimony indicated that there were times when he was rather unhappy at being made the goat in things. He indicated that in his testimony. He mentioned one specific instance that —there was certainly some intimation in his testimony—*

*that he didn't like that. So that I don't think it is too significant if some of the witnesses said that it was Mr. Wilbanks that rejected sections of roadway rather than Mr. Therriault. It doesn't make too much difference anyway. They are both working for the State.*

*One thing that I thought was very significant in this whole situation, that was not alluded to by either counsel in their argument, but to the Court it was extremely significant, was the diary entry in Mr. Therriault's diary one day when he said, "This day Willie pulled the pin." Mr. Therriault was asked about that and was rather evasive, and finally he blurted out something about "Well, Willie said it was long enough and wide enough and deep enough," and about that time Mr. Therriault realized what he was saying and practically swallowed his tongue, but that was very significant. I don't think there can be very much doubt as to what was meant by that. Mr. Wilbanks was just tired of being the goat for rejecting these sections of roadway, and in any event I think that the testimony is overwhelming from all of the witnesses, many of them men of years of experience in this line of work, that the requirements were excessive.* On the other hand, I don't think there is the slightest doubt but what it was an unusually difficult job. It is hard to know just what to do in a case like that, but something has to be done.

I think the proper solution is to allow the Plaintiff in both the first case and the second case half of the amount sought in the complaint. And I base that upon the fact that I feel that probably at least half of this difficulty was caused by the hazards of the contracting business, the unfavorable material, solid rock in one, caliche in the other, and that the other half was caused by excessive requirements. (Italics ours.)

We are satisfied from the oral decision that the trial court determined that the state representatives in charge of the construction under contracts Nos. 1 and 2 were unreasonable and arbitrary in the exercise of their discretion; that their determinations were inaccurate and unreliable, and that it was necessary for the court to consider other evidence in order to determine classification of the quantities excavated.

It is the plaintiff's contention that the record amply supports the foregoing conclusion of the trial court, which we will now discuss.

The plaintiff first contends that the arbitrary and capricious attitude and determinations of the state's resident engineer are demonstrated by the inaccuracy of the monthly estimates as to the progress of the work and his testimony in regard thereto. The estimate reports (exhibit No. 3) were prepared each month by the resident engineer during the progress of the construction contract. They were signed by the resident engineer, Del Therriault, with the certification, *"I certify the above to be based upon actual measurements, and to be true and correct."* (Italics ours.) Mr. Therriault, on the other hand, testified that they were only estimates for the purpose of making progress payments to the contractor for work performed and were not accurate. He testified as follows under cross-examination, referring to the first monthly estimate, from March 23 to April 20, 1954:

Q. . . . You did, of course, on that first estimate certify as to the amount of material moved during that period, did you not? A. I signed the estimate in the designated spot. Q. And you understood that it certified that the estimate was made according to measurement? A. I did not. Q. Pardon me? A. I did not. Q. Well, do you go around signing your name to something that you don't intend to be true? A. The standard specifications cover estimates. Q. Mr. Therriault, I have before me Exhibit No. 3, the first page of that, is that Estimate No. 1? A. Yes, sir. Q. Is this your signature here affixed to to that? A. Yes, sir. Q. And read now what is just ahead of your signature. A. "I certify the above to be based upon actual measurements, and to be true and correct." Q. You knew that was on there when you signed it, didn't you? A. Yes, sir. Q. Now you are undertaking to tell us that that is not true? A. The standard specifications on Page 3— Q. I didn't ask you that. You are trying to tell me now that this on this exhibit that you just referred to, to which you affixed your signature, is not true, is that right? A. That is a partial payment in relation to the amount of work done. Q. I didn't ask you that, Mr. Therriault. You are trying to say now that that is not true? A. Will you ask me that question again, please? Q. I think it is very plain, if you please, Mr. Therriault. You are trying to say now that on Exhibit No. 3, Page 1, which is Estimate No. 1, that when you affixed your signature to this and certified the above to be based

upon actual measurements and to be true and correct, that that is not true? A. It— Q. You just can answer my question. A. The only time that that estimate is true and correct is when it reads Final. Q. Why did you certify that to be true and correct? A. In order for Mr. Saddler to receive a partial payment for the amount of work. Q. Nevertheless you certified it to be true and correct, didn't you? A. I signed it in the proper spot, yes, sir.

The state contends that use of the monthly estimates is excluded by specification Sec. 2.02 in determination of quantities. We disagree. The estimates referred to in this section are those appearing in the contract. Specification Sec. 2.02 provides:

The estimate of quantities *as shown on the plans or in the specifications* shall be used only for comparing bids and determining the amount of the contract. The basis of payment of this contract will be the actual quantities of work performed in accordance with the plans and specifications and as specified therein for payment. (Italics ours.)

The monthly estimates which the trial court considered are not in the plans or specifications, but are estimates which purport to reflect the actual work performed, based upon actual measurements which are certified to be true and correct.

The first monthly estimate stated that 60,500 cubic yards of solid rock had been excavated. The estimates for the first 6 months, up to September 20, recited solid rock excavated as totaling 179,900 cubic yards. On September 20, the plaintiff, considering that the quantity of rock was overrunning his original estimate, purchased and put into operation an 80-D 2½-yard power shovel that had the capacity of moving 200 cubic yards of rock per hour. He also purchased two 12-15 yard dump trucks to work with it. This equipment was in addition to the rock-moving equipment previously used, which was continued in use for the remaining 11 months of the job. The plaintiff testified that the record of operation of the 80-D shovel, alone, from September 20 was 854 hours, in solid rock, which, with the esti-

mated average of 200 yards per hour, amounted to an estimated 170,800 cubic yards. The *solid rock removal recited in the monthly estimates for the succeeding 11 months, as certified by Mr. Therriault, totaled 46,681 cubic yards, as compared to the 179,900 yards allowed in the estimates for the first 6 months during the period the 80-D shovel was not in use.*

The plaintiff also points out the following testimony of the resident engineer, which he contends demonstrates the engineer's arbitrary and prejudicial attitude:

Q. Mr. Therriault, handing you again your diary, Exhibit 38A, I want you to refer to April 4th. A. Yes, sir. Q. Read it. A. "P. Saddler operating Cat at Station 163-169 removing overburden. Whole damn family is on the job today." Q. What did you mean by "The whole damn family is on the job today"? A. The whole damn family was there, Roy, Harry, their wives and et cetera, children. Q. Is that an appropriate remark for a State official? A. It is not. . . . Q. Handing you your diary for 1955, 39B, would you look at May 4th. A. May 4th? Q. May 4th of 1955. A. Yes, sir. Q. Read it. A. "P. L. Saddler on job in the A.M., accompanied by lady friend . . ." Q. What did you mean that Mr. Saddler was accompanied by his lady friend? A. Well, there was a lady with him. Q. Is that lady in the court room? A. Pardon? Q. Is that lady in the court room? A. She is now, yes. Q. Do you happen to know she is his daughter? A. I didn't know it at that time. Q. Is that an appropriate remark to make regarding anybody else? A. That is what I wrote in the diary.

The plaintiff further cites the following testimony which he contends demonstrates the unreasonable and arbitrary requirements the state representatives imposed in regard to the finishing of the subgrade:

A. We had on that project anywhere from one to four graders, motor patrol blades, Number 12's, operated by the best operators we could get from the Union Halls. Union men, qualified operators, and they simply could not satisfy the Resident Engineer in his requirements for a finished grade. They would get it up to where they had on normal projects, and also on our own and others, where it had been acceptable, and the Engineer would

say, *"Well, you have got to go and do it over again. Tear up the whole thing and redo it,"* and mull it back and forth *until this extra time was put in, at no cost to the State, and why it was done and why that requirement was made is still one of the mysteries to me today. I don't understand why the Resident Engineer required us to do that, but he did. Q. Did he have any reason for compelling the work to be redone? A. No reason for it, and we pleaded with him time and again to accept a piece of road. "What more does he want?" "What could we do with it?" We lost a number of patrol blade men. We called on the different Union headquarters in Moses Lake, Ephrata, Wenatchee, even to Spokane, trying to get blade men that could satisfy him, and there was no one that came up to his expectations, and it was just one of those things that happened. That cost us a terrific amount of money, and we don't know why it was done.* (Italics ours.) (P. L. Saddler, direct.)

A. . . . but it seemed like from the time we started on it until the time we finished that, well, it seemed impossible to satisfy anyone with the State on the finishing of it. I believe everybody would have to agree that we had a sufficient number of machines to finish with. We had the best men that there was available; not only the best that was available, but I figured there was one or two of them that were some of the better blade men in the country, and we tried about everything that we could possibly think of. (Harry Saddler, direct.)

Q. Well, what was insisted upon here that you observed with regard to the finishing? A. That you could not finish to what the Inspector insisted on. *He would go down there on the grade, and you would say, "All right, in my estimation that section of road is finished. It is up to blue top. Will you accept it?" He will say, "No." You say "Why?" He will sit here and he will say "Look at it. Look at it. Anybody can tell what is wrong with it." I would say, "Will you point out what is wrong with that grade so I can rectify it, so I can fix it?" "Well, if you can't see it, I can't help you." That was the attitude that was taken.* . . . and we had the best blade men that was available at the time, and they had finished a good number of miles on the road, a lot more than I had ever done, and in their estimation the road was acceptable. It was a better job than they had done on previous jobs. Yet the Resident Engineer would not accept it. What are

you to do in a case like that? You are left up in a quandry of just what to do. (Italics ours.) (Roy B. Saddler, direct.)

Q. What was the experience that you had down there on that job with regard to finishing and it being accepted by the State? A. Well, it seemed like we had quite a lot of trouble. . . . Q. (By Mr. Murray) Now, what do you mean by that, Mr. Malloy? A. Well, it seemed like we would get it where it looked awfully good for that type of highway and, why, it just wouldn't be accepted. . . . A. Well, we tried to hire the best blade men we could in the country, and we had some good ones, I thought; Shorty Rogers, Burwell; tops anywhere. *Q. From your experience and observation, could you see any reason why the grade as you had finished it was not accepted? A. Really I couldn't, no. Q. Did Mr. Therriault or Mr. Wilbanks give you any reason why it wasn't being accepted? A. Well, never confided in me, if they had a reason. Q. What would they say to you when you would ask for the acceptance or say it was up to grade? A. "Do it over." We did it over quite a few times.* (Italics ours.) (Eugene K. Malloy, direct.)

A. Well, like I say, after these blade men would finish a section of sub-grade, put it to blue tops as humanly possible, to the best he could do, and which would be recognized as being acceptable any other time, why either the Inspector or Mr. Therriault would turn it down, say it wasn't ready. (Leonard Blakely, direct.)

A. Well, did have a little trouble in that respect. Usually on a job you have a one-tenth tolerance, in other words, either up or down, but no prominent humps in it. As long as the grade is uniform within a tenth or so either way, why, it has always been acceptable. Q. Was that true in this case? A. No, I wouldn't say that that would be true. I would say that I went back and cut places off on the grade that was less than a half an inch high. . . . Q. When you speak of tenths, that is tenths of a foot, is that right? A. Tenths of a foot, yes. . . . Q. (By Mr. Murray) What would happen when you would bring the road to what you thought was blue top and undertake to have it accepted? A. Well, the Inspector on the job, which was Willy Wilbanks, *would tell me I would have to go back and do it over. Q. Did that happen frequently on the same particular section of road? A. Yes. Q. Give you any particular excuse as to why you had to do it? A. It just didn't suit him, that is all.* (Italics ours.) (William P. Wells, direct.)

We are satisfied that the record supports the trial court's conclusion as to the unreasonable and arbitrary determinations of the state representatives in charge of the construction contracts in question, and, particularly, as to the unreliability of the classification by the resident engineer of the quantity of solid rock excavated by the plaintiff, of which the trial court said it was *convinced beyond a shadow of a doubt.*

■ The trial court was, therefore, entitled to consider other evidence in the determination of the factual issues raised. *Ward v. Smith, supra.* The plaintiff further contends that the consideration of other evidence in determining the classification of the quantity of solid rock and class A material excavated was also justified on the basis of the following testimony, which the trial court was entitled to believe:

The plaintiff, P. L. Saddler, testified as follows under direct examination:

A. Well, I am sure that all present realize that in the absence of an engineer of your own being employed on the job from the beginning to its completion, not anticipating such a thing occurring as what did occur, and by the time we had first started to dispute the quantities allowed *it was too late then to start in with an engineer of our own to determine these quantities, well, therefore, in the absence of that method of computing yardages we turned to the only other method that was available to us, namely the amount of powder that was used and the amount of equipment time used in moving rock.* (Italics ours.)

Q. Well, after the dispute arose in August, could you not have then gotten an engineer to check the State's figures? A. Not very well, because it wasn't a case of checking their figures; again, the classification. We are not disputing the over-all quantity, it is the classification, and by that time we had worked the entire length of that time and it was torn up until it would have been all but impossible for an engineer to come in and go over that project from one end to the other with any degree of accuracy without taking the same contours that the State had, which wouldn't have been a comparison at all. . . . Q. Did you check the monthly estimates on this job? A. Did I check them? Q. Yes. A. Naturally, yes.

Q. But you didn't pay any attention to the monthly estimate quantities stated in those, but you did on the monthly estimates in the solid rock and the— A. We got to the point where we were bickering so much that I thought we would wait and see what the final estimate would be in the hopes it would be made up in the final settlement. The same thing would apply on the first one. I never dreamed that there wouldn't be some consideration given on the final estimate on both schedules.

Harry Saddler, a superintendent for the plaintiff, testified as follows on cross-examination:

Q. Do you rely on the use of equipment time to arrive at the value of solid rock involved in Contract No. 1? A. Not normally, Mr. Level, no. On this particular job we didn't have an engineer. At one time we were getting to the position where we figured we needed one. I asked Mr. Ted Morehouse [district engineer for the State Highway Department] one time if he thought it would be expedient or the thing for us to do as a company doing this kind of work to employ a civil engineer, and he advised against it. Q. When was that? A. Oh, sometime during the course of this conversation. He named some companies that had engineers, and he said that all that happens is the engineers get to arguing among themselves, and he said you wind up in more trouble than you would have without them, and he said you are better off not having one.

■ The record contains extensive testimony by powdermen with many years' experience in rock excavation, who gave their expert opinions as to the amount of powder required to blast a cubic yard to permit its removal. The testimony showed the solid rock removed to be a diced basalt that did not require the normal amount of powder because of its shattering propensities. According to the testimony, from six-tenths to eight-tenths of a pound of powder is required per cubic yard for its removal. The trial court considered this to have been the *most conservative* of *the best evidence available,* and determined the yardage by using further caution in adopting a formula of one pound of powder per cubic yard for solid rock removal. We find no error committed by the trial court *under the circumstances of this case* in adopting this formula. It was entitled to con-

sider the best evidence available. *Brear v. Klinker Sand & Gravel Co.*, 60 Wn.2d 443, 374 P.2d 370 (1962). We hold that its award for solid rock removal is supported by the record.

Having concluded that the trial court was entitled to consider other evidence than that based on cross sectioning, its determination of the quantity of class A excavation was purely a question of fact, which also is supported by the record. *Romano Engineering Corp. v. State, supra.*

Since we have held that the testimony supports the trial court's determination that the state representatives in charge at the jobsite were unreasonable and arbitrary, the plaintiff was not bound by specification Sec. 5.01, *supra,* relating to finality of determination by the Director of Highways (his representative in this case). *Coyle Constr. Co. v. Skagit Cy., supra.* The award for the cost incurred by the plaintiff resulting from the excessive finishing requirements is a question of fact and is supported by the record.

No error was assigned by the state to the trial court's direction that the amount be paid to the plaintiff that was withheld from payments to plaintiff in lieu of penalties for delay in the completion of the contracts. The state argues, however, that under specification Sec. 8.03, this return of the penalties constitutes an extension of time for the completion of the contract; that in *Goss v. Northern Pac. Hospital Ass'n*, 50 Wash. 236, 96 Pac. 1078 (1908), under a similar contract, we held that no other remedy was available where an extension of time was provided for the contract's completion. The *Goss* case is not apposite. Recovery here is predicated on a breach of the contract by reason of the unreasonable and arbitrary determinations and requirements of the state's representatives.

We do not consider the plaintiff's cross-appeal for the reason that it was untimely filed.

The judgment of the trial court is affirmed.

ROSELLINI, C. J., HILL and HALE, JJ., and SOULE, J. Pro Tem., concur.

July 14, 1965. Petition for rehearing denied.