[No. 3206–1. Division One. May 9, 1977.]

THE CITY OF SEATTLE, *Respondent*, v. DYAD
CONSTRUCTION, INC., *Appellant*.

*Casey, Pruzan, Kovarik & Shulkin* and *Richard A. Acarregui,* for appellant.

*John P. Harris, Corporation Counsel,* and *Gordon F. Crandall, Assistant,* for respondent.

*Edward L. Mueller* and *Herman S. Siqueland,* amici curiae.

CALLOW, J.—This case concerns the interpretation of a public works contract. It involves a claim for damages by the contractor for delays claimed to have been caused by the municipal corporation. Dyad Construction, Inc. (hereinafter called the contractor), appeals from a judgment entered denying its counterclaim for recovery of delay damages in an action initiated by the municipality, the City of Seattle (hereinafter called the City), for recovery of moneys asserted to have been erroneously paid to the contractor. The City cross–appeals from that portion of the judgment in the same action that awarded the contractor $12,725 for extra work done at the City's request.

In July 1971, the City called for bids to construct a project known as the 44th Avenue Southwest Sanitary Sewer Improvement. The project was to commence at the south city limits, and proceed northwesterly along Seola Beach on Puget Sound to a residential area known as "The Arroyos."

The location of the proposed sewer line, designed in its entirety by the City, was shown on the plans, staked by the City's survey crew, and examined by the contractor before bids were submitted. The contractor was the low bidder and was awarded the contract. The sewer trench was to be cut through the sands and gravel of tide flats skirting the base of a bluff and breakwaters on the easterly side, with

the tide flats on the westerly side. Work on the beach could only take place during periods of favorable low tides.

The project was begun the first week of August 1971. While proceeding along Seola Beach, the contractor encountered ground water carrying silt and sand coming from beneath the adjacent bulkheads. The City was concerned about the protection of bordering private property and ordered the work to stop on August 5, 1971. Correspondence between the two parties resulted in the contractor beginning work again and implementing, under protest, corrective procedures required by the City that involved the installation of sheet piling and the replacement of native beach material with imported backfill. As the contractor neared the location of manhole No. 1 on September 3, 1971, ground water and vibrations from the excavation work caused a slide behind the backhoe. The contractor stopped work and asked the City to redesign the line and move it farther out on the beach, asserting that while construction there was not impossible, it was impractical, dangerous and expensive.

The state safety inspector responsible for the job considered the location unsafe, and that building the line farther out on the beach would be safer. The initial revision of the line's design by the City did not satisfy the state safety inspector. In April 1972, the City submitted a second revised plan which was deemed far enough out on the beach to assure safe construction. The line was completed approximately 4 months later than planned. The City then commenced this action to recover money claimed to have been erroneously paid to the contractor, and the contractor counterclaimed.

The trial court found that the work was fully completed by the contractor and made the following additional findings of fact pertinent to this appeal:

III.

Dyad gave to the City timely and proper notice of its claims against the City for extra compensation because of

alleged breach of contract, extra work, owner interference, and other grounds which at time of trial Dyad alleged to be $61,676.

IV.

The parties have stipulated in open court that the City made an unintentional and mistaken payment to Dyad of $30,431.94, and that Dyad should without consideration of its other claims in this lawsuit be entitled to a credit against this mistaken payment of $1,486.62 for certain extra work items which are undisputed. This $28,945.32 ($30,431.94 less $1,486.62) is a valid claim against Dyad, subject to the offsets hereinafter set forth in Finding IX. The net sum of $16,220.32 ($28,945.32 less $12,725) bears interest at the rate of 6% per annum from March 8, 1973, to date of entry of the judgment.

V.

. . . On August 5, and thereafter, the City interfered with and shut down Dyad's operations. The City ordered Dyad to install tight interlocking sheeting in the area of the bulkheads, and also directed that the excavated native beach material be replaced by a select type of imported backfill.

VI.

The City did not have the right under the contract to require sheet piling and to direct a particular method of operation with regard to the contractor's (Dyad's) compliance with the contract. . . . It was up to the contractor to determine what construction methods were proper. It has not been established that there was any clear danger to any of the bulkheads or adjoining property by reason of the Contractor's method of construction. Dyad was operating in a workmanlike fashion and was utilizing normal contemplated construction procedures. If there was any incidental damage Dyad was required to repair it under the terms of the contract.

VII.

The City did not have the right to, in effect, become the contractor insofar as supervising and requiring particular methods of construction with regard to the sheet piling operation. The City arbitrarily and without justification directed the manner and method of Dyad's performance. The effect of this improper interference of the City was to materially increase the scope of the work required of the Contractor, to delay his operations, and

to cause extra costs in labor and equipment. By reason of the City's interference in its operations the Contractor was delayed in his operations from August 5, 1971, to August 31, 1971, when Dyad was permitted to resume normal operations. Dyad is entitled to recover for the expenses incident to the sheet piling operation, plus the costs incident to the days on the beach that were lost by reason of that operation.

## VIII.

Dyad is not entitled to its expenses with regard to the select backfill. The City did specifically retain on that item the right to control the type of backfill that would be used. The City did not have the similar right with regard to the sheet piling that they tried to impose.

## IX.

The damages which Dyad is entitled to recover for the sheet piling portion of its claim . . . [total] $12,725.

## X.

The City provided Dyad with plans and specifications which located the beach sewer line at the vicinity of Manhole #1 in the toe of a highly unstable sandy cliff rising vertically some three hundred feet in height, and covered with slide debris. There was no justifiable reason for locating the line in its designated location. The specifications which placed this line so close to the toe of the bluff were improper specifications, in that they, in effect provided for a line that could not feasibly be completed because of the state's safety requirements and because of the practical inability to safely engineer and complete such a project in that area. Any construction activity at the toe of this bluff would very probably have triggered a slide which could have resulted in death to the workmen beneath. There was no feasible way to provide shoring or other protective measures in this area, using normally accepted construction procedures, to permit the line to be installed while at the same time providing a safe place to work for the men and equipment.

## XI.

Dyad discovered the improper specifications on September 3, 1971, and immediately notified the City that the line should be moved. The City did not give Dyad adequate plans to complete the beach line until late April, 1972. Dyad did not and was not obligated to have discovered or anticipated the plans were defective in this

area. The result of the City's providing improper plans was to delay Dyad's completion of the contract for four months. Because the line had to be installed on the beach, the contractor could only work during a period of favorable low tides. Time was of the essence, and the City's improper plans caused the contractor to be unable to complete the beach work in the fall of 1971.

XII.

The delay in the project from the fall tides until the spring tides was caused by the error in specification and plan. But for the City's erroneous plans and specifications, Dyad could have completed the entire contract work in the fall of 1971.

XIII.

Dyad suffered substantial damages as a result of the design failure and for the delay factor. The damages . . . proven as being reasonably related to that breach [are in the sum of] $47,099.

XIV.

The City–caused delays from interference and faulty design demolished Dyad's intended cost structure as well as its time structure. This resulted in Dyad's being unable to proceed in a normal contemplated manner to construct the project.

Based upon these findings, the trial court concluded that:

(1) the contractor was entitled to the $12,725 expended in the sheet piling operation;
(2) there was an implied duty not to hinder or delay the contractor's performance, and an implied warranty that if its plans and specifications were complied with, the contractor would be able to complete the project on time, and both obligations were breached by the City;
(3) the contractor would be entitled to the $47,099 delay damage it had proved under the contract but for the ruling of *Goss v. Northern Pac. Hosp. Ass'n,* 50 Wash. 236, 96 P. 1078 (1908), on time extension clauses as exclusive remedies. On the basis of the *Goss* decision, the trial court denied recovery of damages for delay.

The issue to be resolved on the cross–appeal is whether the City acted within its contractual authority in directing the contractor to undertake the sheet piling operation. The

issues that must be resolved on the appeal of the contractor are (1) whether damages for delay are to be denied due to the contractual provision entitling the contractor to an extension of time for performance if delayed through no fault of its own, and (2) whether the contractor should be awarded prejudgment interest from April 23, 1974.

## WHAT WAS THE AUTHORITY OF THE CITY IN REGARD
## TO DIRECTING THE INSTALLATION
## OF SHEET PILING?

 The City claims that the findings were not supported by the evidence. However, the record contains substantial evidence that (1) the contractor's work was confined to the easement; (2) there was not a "clear danger" to adjacent property from the contractor's methods; (3) the contractor was operating in a workmanlike fashion and using normal contemplated construction procedures; and (4) the City directed a particular manner and method of performance by the contractor. Findings supported by substantial evidence cannot be overturned on appeal. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959); *Rogers Walla Walla, Inc. v. Ballard*, 16 Wn. App. 81, 553 P.2d 1372 (1976).

The contract provided in part:

35. Architect/Engineer's Authority
The Architect/Engineer shall give all orders and directions contemplated under this contract and specifications, relative to the execution of the work. The Architect/Engineer shall determine the amount, quality, acceptability, and fitness of the several kinds of work and materials which are to be paid for under this contract and shall decide all questions which may arise in relation to said work and the construction thereof. The Architect/Engineer's estimates and decisions shall be final and conclusive, except as herein otherwise expressly provided. In case any question shall arise between the parties hereto relative to said contract or specifications, the determination or decision of the Architect/Engineer shall be a condition precedent to the right of the

> Contractor to receive any money or payment for work under this contract affected in any manner or to any extent by such question.
>
> The Architect/Engineer shall decide the meaning and intent of any portion of the specifications and of any plans or drawings where the same may be found obscure or be in dispute. Any differences or conflicts in regard to their work which may arise between the Contractor under this contract and other Contractors performing work for the Owner shall be adjusted and determined by the Architect/Engineer.

We construe this section as placing the duty of inspection and acceptance or rejection of the work upon the architect/engineer. The actual supervision and direction of the manner in which the work is to be done is not within the authority of the City under this clause. A reading of the entire contract indicates that the division of responsibility between the architect/engineer, acting on behalf of the City, and the superintendent, acting on behalf of the contractor, places the duty of inspection and acceptance on the architect/engineer, but permits the contractor to say how the work will be performed so long as that performance will produce a result that meets the specifications of the contract.

We do not agree with the assertion of the City that its engineer's decisions regarding the danger and necessity of the sheet piling operation were conclusive, when considered in light of the trial court's findings of fact. We acknowledge that the City's inspector testified that something different had to be done to correct what he saw as a dangerous condition, but the trial court found otherwise. *Saddler v. State,* 66 Wn.2d 215, 401 P.2d 848 (1965), does not support the City's assertion. The contract in the *Saddler* case contained a clause pertaining to the authority of the engineer which provided that the "'work . . . is to be done under the direct supervision'" of the Director of Highways, and that "'the decision of the Director of Highways . . . as to all questions arising as to the proper performance of the work shall be final.'" *Saddler v. State, supra* at 217–18. The

standard specifications which are a portion of the contract in this case provide that "Nothing contained in the contract shall be construed as requiring the Engineer to direct the method or manner of performing the work." When this provision is read in conjunction with the section entitled Architect/Engineer's Authority, set forth above, we find a major difference in the placement and imposition of authority when we compare the contract clause in the *Saddler* case and the instant situation. In the *Saddler* case the engineer designated by the Director of Highways had the final decision in all questions as to the *performance* of the contract, while here the architect/engineer was concerned primarily with the "amount, quality, acceptability and fitness of the several kinds of work and materials."

The trial court found that it was not "established that there was any clear danger to any of the bulkheads or adjoining property by reason of the Contractor's method of construction." The trial court's findings on the situation determine that an emergency did not exist, and so the contract clause on emergencies does not come into play. The clause is enlightening, however, in understanding the authority of the parties. The clause places the initial responsibility for handling emergencies which threaten property or life upon the contractor unless the architect/engineer has been notified of the existence of an emergency. If the architect/engineer has been notified of an emergency by the contractor and the contractor has taken no action, only then is the contractor subject to the instructions and authorization of the architect/engineer. Here, no emergency existed, the contractor did not notify the architect/engineer that an emergency existed, and the contractor was free to perform the work in his own way.

Under the findings of the trial court that Dyad was operating in a workmanlike fashion, was using normal contemplated construction procedures, and that no clear danger to adjacent property had been shown that would justify the action taken by the City, the architect/engineer did not

have power to order the taking of extra "protective" measures. Dyad is entitled to recover the expenses incident to the installation of the sheet piling.

### Is the Contractor Entitled Under the Contract to Damages for the Delay Which Occurred Through no Fault of its Own?

The contract clause which the City asserts limits the contractor to an extension of time for performance and precludes the recovery of damages reads in pertinent part:

> 8.07 Unavoidable Delays
>
> Should the Contractor be delayed in the prosecution or completion of the work by the act, neglect, or default of the Owner, any of its officers or employees, any other contractor employed by the Owner upon the work, or by any damage caused by fire or other casualty for which the Contractor is not responsible, . . . in no way caused by or resulting from default or collusion on the part of the Contractor, then the time herein set for the completion of the work shall be extended for a period equivalent to the work time lost by reason of any or all of the causes aforesaid. The extended time period shall be determined and fixed by the Owner, which determination shall be final, but no such allowance shall be made unless a claim therefor is presented in writing to the Owner within ten (10) days after the occurrence of such delay.

The trial court stated that although the contractor had established that damages had been suffered because of the delays caused by the City, the contract clause barred the recovery of monetary damages.

The case at the center of the controversy, which the trial court felt was controlling, is *Goss v. Northern Pac. Hosp. Ass'n,* 50 Wash. 236, 237, 96 P. 1078 (1908). The contract there, a contract for the construction of a hospital, provided that if the general contractor was

> obstructed or delayed in the . . . completion of his work by the act, neglect, delay or default of the owner or the architects, or of any other contractor employed by the owner upon the work, . . . then the time herein fixed for the completion of the work shall be extended for a period

equivalent to the time lost by reason of any or all the causes aforesaid; . . .

The contract for plumbing and heating was placed independently to a third party contractor who did not timely perform, thereby delaying the prime contractor. Suit was commenced for extras and for damages for the delay. The trial court's withdrawal of the delay damages claim from the jury was upheld, the opinion stating at page 239:

> [W]here the probability of the happening of the condition has been foreseen and a remedy is provided for its happening, the presumption is that the parties intended the prescribed remedy as the sole remedy for the condition, and this presumption is controlling where there is nothing in the contract itself or in the conditions surrounding its execution that necessitates a different conclusion.

The court concluded that the parties had intended to set forth the limits and extent of their rights in the contract, and that since the contract provided for an extension of time for performance in the event of delay any further remedy in damages was precluded.

*Hetherington–Berner Co. v. Spokane,* 75 Wash. 660, 135 P. 484 (1913), held, without reference to the *Goss* case or citation of authority, that where the contract called for a completed structure by a certain date with damages of $10 per day for each day thereafter to the municipality and the owner–municipality was at fault in delaying the contractor, that the contractor could recover monetary damages. No mention is made in the case of an extension of time as being the remedy for owner's delays. The court stated that the City's delays, after it had led the contractor to believe that it would perform at a given time, caused corresponding delays in the work of the contractor causing loss "because its workmen were compelled to remain idle during these periods of delay." *Hetherington–Berner Co. v. Spokane, supra* at 662.

Then came *Dietrich v. Seattle,* 95 Wash. 654, 655, 164 P. 251 (1917), which involved a contract with the City of

Seattle for street improvements. The contract provided in part:

> It is agreed that if the contractor . . ., or the city . . ., shall be unable to complete any portion . . . by reason of court proceedings enjoining the construction or completion of any portion . . . and it shall . . . be impracticable to construct . . ., then . . . the contractor shall waive any and all claim or claims for damages by reason of such inability to construct . . .

During the course of the work, the contractor was enjoined from proceeding by adjoining landowners, and it was 4 months before the work could be continued and ultimately completed. The contractor sued the City for the loss caused by the delay. Again without reference to the *Goss* case or the citation of authority, the court stated:

> But the clause deals with injunction proceedings and seems to have been provided to meet the very contingency which here happened. It provides, first, a method of adjustment if by reason of the injunction proceeding the improvement cannot be completed, and for a waiver of damages on the part of the contractor should such a contingency happen; and second for a resumption of the work should the court proceedings allow it, providing that in the case of the happening of the latter event "no extra payment will be allowed said contractor for change in price of material or labor for any other reason whatsoever." This language is broad enough to preclude a recovery of damages caused by injunction proceedings, even though the proceedings be the direct result of the fault of the city. The contract seems to be, as the trial court remarked, a harsh one when applied to a condition like one shown in the present record, but parties are at liberty to make their own contracts, and there must be some form of overreaching or fraud before the courts can relieve from them. Nothing of this character is here shown.

*Dietrich v. Seattle, supra* at 656–57.

In *Byrne v. Bellingham Consol. School Dist. 301*, 7 Wn.2d 20, 24, 108 P.2d 791 (1941), a subcontractor sought damages for delays from the owner. The contract clause controlling the situation read in part:

"Art. 18. Delays and Extension of Time.—If the Contractor be delayed at any time in the progress of the work by any act or neglect of the Owner . . . or the Architect, or of any employe of either, or by any other Contractor employed by the Owner, . . . then the time of completion shall be extended for such reasonable time as the architect may decide. . . .

"This article does not exclude the recovery of damages for delay by either party under other provisions in the contract documents."

The building was not completed on schedule by the general contractor, and the electrical subcontractor was 11 additional months on the job as a result. The court, in construing the contract, observed at page 31:

Article 18 . . . provided that, if the contractor should be delayed at any time in the progress of the work by any act or neglect of the owner, the architect, or any employee of either, or by any other contractor employed by the owner, or by the occurrence of any one of certain contingencies therein specifically mentioned, including any cause which the architect should decide was sufficient to justify a delay, then the time of completion should be extended for such a period as the architect should deem reasonable. Article 18, however, further provided specifically that its provisions did not exclude the recovery of damages for delay by either party "under other provisions in the contract documents." It will also be recalled that article 31 provided that, if either party to the contract should suffer damages *in any manner* because of any wrongful act or *neglect of the other party,* or *of anyone employed by him,* the party damaged should be reimbursed for such damages by the other party.

The court then stated at pages 31–32:

[I]n the absence of any provision in the contract to the contrary, a building or construction contractor who has been delayed in the performance of his contract may recover from the owner of the building damages for such delay if caused by the default of the owner. *Hetherington–Berner Co. v. Spokane,* 75 Wash. 660, 135 Pac. 484, 115 A. L. R. 66. Such right of recovery is predicated upon the breach of what we have already stated is an

implied obligation on the part of an owner to furnish to the contractor a building in a state of forwardness sufficient to enable the contractor to complete his contract within the time limit.

The opinion then comments upon the *Goss* case, observing that its result turned upon the pertinent contract provisions in that case, which permitted no recourse other than allowing an extension of time for performance equal to the period of delay. The decision held that in construing the contract (a) ambiguities should be resolved against the party that prepared the instrument, (b) while a limitation may be placed on the right to recover damages, the harshness of such a result requires strict construction of the language, and (c) all provisions of the contract must be considered as a whole. It was concluded that the acceptance of the extension of time was not a waiver of the right to recover damages and that the contract provisions did not exclude the right to recover damages caused by delay. We read the case as turning on the provision expressly permitting the recovery of damages even though an extension of time could also be claimed.

The same issue was presented in *Ericksen v. Edmonds School Dist. 15,* 13 Wn.2d 398, 405, 125 P.2d 275 (1942), wherein the contract clause was quite similar to that before us save that the *Ericksen* clause more specifically stated: "'The Contractor shall not be entitled to any claim for damages on account of hindrances or delays from any cause whatsoever . . .'"

The rule was stated to be that, absent any provision in the contract to the contrary, a contractor who has been delayed in the performance of his work may recover damages for the delay if it was caused by the owner. This rule was said to be based on the owner's implied obligation to keep the work of construction in such a state of forwardness that the contractor can complete his work within the required time. On the other hand, if the contract expressly precludes damages for any delay caused by the owner, that

provision will be upheld. The court held that the *Goss* case was controlling since:

The probability of the occurrence of delays was clearly foreseen by the parties to this action, as the language of the contract repeatedly discloses, and they specifically provided that the contractor's remedy therefor should take the form of an extension of time. The presumption therefore is that the parties intended such an extension of time to be the sole remedy for delays encountered in the performance of the contract. Furthermore, there is nothing in the contract or in the conditions surrounding its execution that necessitates a different conclusion.

*Ericksen v. Edmonds School Dist. 15, supra* at 412. *See also American Pipe & Constr. Co. v. Harbor Constr. Co.*, 51 Wn.2d 258, 317 P.2d 521 (1957); *United Glass Workers' Local 188 v. Seitz*, 65 Wn.2d 640, 399 P.2d 74, 13 A.L.R.3d 1000 (1965); *Bignold v. King County*, 65 Wn.2d 817, 399 P.2d 611 (1965).

*Saddler v. State*, 66 Wn.2d 215, 401 P.2d 848 (1965), distinguished the *Goss* case, stating that its holding is that no other remedy is available where an extension of time is provided for a contract's completion, but that recovery would be allowed in the instant case (*Saddler*) because of the unreasonable and arbitrary determinations and requirements of the owner.

In *V.C. Edwards Contracting Co. v. Port of Tacoma*, 83 Wn.2d 7, 11, 514 P.2d 1381 (1973), the contract provision read:

*Provided further,* that the Contractor shall not be charged with liquidated damages or any excess cost when the delay in completion of the work is due:
(a) . . .
(b) To unforeseeable cause beyond the control and without the fault or negligence of the contractor, including but not restricted to, acts of God, or of the public enemy, acts of the owner, acts of another Contractor in the performance of a contract with the Owner, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and severe weather . . .

The decision pointed out that the provision referred only to the rights of the owner against the contractor, said nothing concerning *the contractor's rights against the owner,* and served only to release the contractor from liquidated damages if he had been delayed by any of the causes set forth in the provision.

The opinion discusses the *Goss* case, stating that it is not in conflict with the holding since under the terms of the contract in the *V.C. Edwards Contracting Co.* case, a time extension was not the sole remedy provided for delay. The opinion stated that the holding of the *Goss* case was that in the absence of any provision to the contrary, a contractor who has been delayed in the performance of his contract may recover from the owner damages for delay if the delay was caused by the owner's default. The opinion points out that these cases turn on the construction of the applicable contract clauses, and that each clause must be looked to to ascertain whether it is preclusive and forbids any recourse other than an extension of time or allows damages as well. The terms of the clause in the *Goss* case are reiterated, with the court noting that that clause made additional time the extent of the contractor's remedy when delay was caused by "'act, neglect, delay or default . . .'" *V.C. Edwards Contracting Co. v. Port of Tacoma, supra* at 12. Those are the exact words of the clause before us.

Recently we held in *S.L. Rowland Constr. Co. v. Beall Pipe & Tank Corp.,* 14 Wn. App. 297, 540 P.2d 912 (1975), where the contract clause provided for a waiver of damages for hindrance and delay but permitted corresponding time extensions, that such a provision barred the contractor from recovering damages for delays caused by plan changes by the municipality. We pointed out that while "no damage" clauses are strictly construed, when such clauses are clear they are not open to construction.

This lengthy review of the cases construing delay clauses is of help in comprehending the development and evolution of the law in this area. The decisions have uniformly held that if an extension of time for performance is

provided for in the contract as the remedy for delay caused by the owner, the contractor is precluded from recovering damages because the contingency of delay has been foreseen and provided for. However, the tenor of the reported opinions has shown a recognition that extenuating circumstances may exist and an acknowledgment that there are limitations on the rule. As perceived in *V.C. Edwards Contracting Co. v. Port of Tacoma, supra,* delay clauses are to be strictly construed because of the harsh results that may flow from their enforcement, delays may be so substantial as to be beyond the reasonable contemplation of the parties, and delays may be so large that they devastate the planned cost and time structure upon which the contractor based his bid. The *Edwards* case also pointed out that there is in every construction contract an implied term that the owner will not hinder or delay the contract, and that if the delay caused by the owner brought about new conditions which the contractor should not have been required to have discovered or anticipated, then the contractor is entitled to damages as well as to an extension of time. *See also Bignold v. King County, supra; Haley v. Brady,* 17 Wn.2d 775, 137 P.2d 505, 146 A.L.R. 859 (1943). Further, when an owner furnishes plans and specifications for a construction project prescribing a time for completion of the work, there exists an implied warranty that the contractor will be able to complete the project timely, as designed. *Prier v. Refrigeration Eng'r Co.,* 74 Wn.2d 25, 442 P.2d 621 (1968); *Armstrong Constr. Co. v. Thomson,* 64 Wn.2d 191, 390 P.2d 976 (1964).

The trial court's findings observed that the City arbitrarily and without justification directed the manner and method of the contractor's performance insofar as the installation of the sheet piling was concerned, and that the effect of this improper interference of the City was to materially increase the scope of the work required of the contractor and delay his operations in that regard. The trial court further found that there was no justifiable reason for locating the sewer line in its designed location at the toe of

the highly unstable, sandy cliff, that the specifications which placed this line so close to the toe of the bluff were improper, that the City took from early September 1971 until late April 1972 to provide adequate plans for the relocation of the line, that the result of the City's providing improper plans was to delay completion of the contract for 4 months, and that but for the City's erroneous plans and specifications the contractor could have completed the work on time. Finally, the trial court found that the City-caused delays "from interference and faulty design demolished" the contractor's cost and time structures.

These findings demonstrate changed conditions that could not have been anticipated, brought about by active interference and unforeseeable delays that transcend the contract. *V.C. Edwards Contracting Co. v. Port of Tacoma, supra; Saddler v. State, supra; S.L. Rowland Constr. Co. v. Beall Pipe & Tank Corp., supra.*

In *Hawley v. Orange County Flood Control Dist.,* 211 Cal. App. 2d 708, 27 Cal. Rptr. 478 (1963), the contractor was to construct a sewer line in accordance with plans prepared by the flood control district. When the contractor began excavating the trench for the sewer line, the district notified the contractor that the wrong type of manhole had been designated in the plans and instructed the contractor not to install any manholes until revised plans were issued. The contractor informed the district that allowing the trenches to remain open for a long period of time under the circumstances was dangerous, but proceeded with the remainder of the work and, as ordered, left the sewer trenches open for nearly 60 days awaiting revised plans. The banks of the sewer trenches ultimately caved in, knocking the sewer line out of place. The trial court found that the contractor had proven a breach of contract based upon the unreasonable delay of the district in furnishing the revised plans, but concluded that the contractor could not recover damages because of the specifications which provided that if the contractor suffered delay caused by the district

the contractor shall be entitled to an extension of time equivalent to the time lost for any of the above–mentioned reasons, but shall not be entitled to any damages for such delay.'

*Hawley v. Orange County Flood Control Dist., supra* at 712.

The district contended that the delay clause was so unequivocal that the contractor must be deemed to have "assumed the risk" of prevention or hindrance by the owner. It was held, however, that the delay had been caused so arbitrarily and was so unreasonable that it was not within the contemplation of the parties when the contract was entered into, and therefore the delay clause did not cover delays amounting to a breach of the contract. The opinion recites a number of cases which held that where delays are unreasonable and so extensive that they are not within the contemplation of the parties, the clause limiting the recourse for delay to an extension of time will be rejected as a defense to the recovery of damages since such clauses will not be so construed as to put one party at the mercy of the other.

The factual situation in this case dictates that the contractor be awarded damages, as well as being permitted an extension of time for performance. The delay was not contemplated by the parties at the time of the entering into of the contract, the delay was unreasonable in duration, and it resulted in part from the active interference of the owner with the work of the contractor. *Peter Kiewit Sons' Co. v. Iowa S. Util. Co.,* 355 F. Supp. 376 (S.D. Iowa 1973); *Carl M. Halvorson, Inc. v. United States,* 461 F.2d 1337 (Ct. Cl. 1972); *La Crosse Garment Mfg. Co. v. United States,* 432 F.2d 1377 (Ct. Cl. 1970); *Chaney & James Constr. Co. v. United States,* 421 F.2d 728 (Ct. Cl. 1970); *Litchfield Mfg. Corp. v. United States,* 338 F.2d 94 (Ct. Cl. 1964); *Laburnum Constr. Corp. v. United States,* 325 F.2d 451 (Ct. Cl. 1963); *George A. Fuller Co. v. United States,* 69 F. Supp. 409 (Ct. Cl. 1947); *Hawley v. Orange County Flood Control Dist., supra; Grant Constr. Co. v. Burns,* 92 Idaho 408, 443

P.2d 1005 (1968); *State v. Feigel*, 204 Ind. 438, 178 N.E. 435 (1931); *Buckley & Co. v. State*, 140 N.J. Super. 289, 356 A.2d 56 (1975); *Robert Chuckrow Constr. Co. v. Horowitz Bros., Inc.*, 30 App. Div. 2d 789, 291 N.Y.S.2d 921 (1968); *Gasparini Excavating Co. v. Pennsylvania Turnpike Comm'n*, 409 Pa. 465, 187 A.2d 157 (1963); *Psaty & Fuhrman, Inc. v. Housing Auth.*, 76 R.I. 87, 68 A.2d 32, 10 A.L.R.2d 789 (1949); *Algernon Blair, Inc. v. Norfolk Redevelopment & Housing Auth.*, 200 Va. 815, 108 S.E.2d 259 (1959); *Validity and Construction of "No Damage" Clause With Respect to Delay in Building or Construction Contract*, Annot., 74 A.L.R.3d 187 (1976).

The judgment of the trial court in denying the contractor damages for delay is reversed and the contractor is awarded the sum of $47,099 for the delay caused by the City.

## Prejudgment Interest

■ Prejudgment interest is allowable (1) when an amount claimed is liquidated, or (2) when the amount claimed is unliquidated and this amount is determinable by computation with reference to a fixed standard contained in the contract. *Elte, Inc. v. S.S. Mullen, Inc.*, 469 F.2d 1127 (9th Cir. 1972); *Prier v. Refrigeration Eng'r Co.*, 74 Wn.2d 25, 442 P.2d 621 (1968); *Mall Tool Co. v. Far West Equip. Co.*, 45 Wn.2d 158, 273 P.2d 652 (1954). A liquidated claim is one where the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance on opinion or discretion. C. McCormick, *Damages* § 54 (1935). Evidence was offered on the amount of damages suffered, and the trial court accepted Dyad's figures. The amount of loss could be definitely fixed from the facts proven. The existence of a dispute over part or all of a claim does not change that claim from a liquidated to an unliquidated one. It is the character of the claim and not of the defense that determines the question. *Prier v. Refrigeration Eng'r Co., supra;* C. McCormick, *supra* at 215–16. The claim for prejudgment interest is allowed.

The judgment of the trial court is affirmed in part and reversed in part, and the contractor is awarded damages in the amounts found by the trial court to be due for the installation of the sheet piling and for delay, together with interest thereon computed from April 23, 1974.

SWANSON and ANDERSEN, JJ., concur.

Petition for rehearing denied September 27, 1977.

Review by Supreme Court pending March 3, 1978.