**ROY A. ELAM MASONRY, INC., Plaintiff/Respondent,**

v.

**FRU–CON CONSTRUCTION CORPORATION, Defendant/Appellant.**

No. 68114.

Missouri Court of Appeals, Eastern District, Division Three.

March 26, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 30, 1996.

Application to Transfer Denied June 25, 1996.

Timothy R. Thornton, Herbert J. Wedemeier, Greensfelder, Hemker & Gale, P.C., St. Louis, for appellant.

J. Dennis O'Leary, Dubail, Judge, P.C., St. Louis, for respondent.

GARY M. GAERTNER, Judge.

Defendant/appellant, Fru–Con Construction Corporation ("Fru–Con"), appeals the judgment of the Circuit Court of the City of St. Louis entering judgment on a jury verdict of $600,000 in favor of plaintiff/respondent, Roy A. Elam Masonry, Inc. ("Elam"), on Elam's breach of contract action, and amending the judgment to include an additional $205,902.62 in prejudgment interest. We reverse the judgment of the trial court and remand for dismissal of Elam's action without prejudice.

Fru–Con raises eight points on appeal. As we find the first point dispositive, we address only those parts of the record relevant to the first point.

On November 14, 1988, Fru–Con entered into a contract with Southwestern Redevelopment Corp. II ("SRC") to construct the Southwestern Bell St. Louis Data Center Project for $103,901,483 ("the General Contract"). Fru–Con was to commence work on November 14, 1988, and achieve "substantial completion" of the Data Center 820 calendar days later, on February 11, 1991.

In early 1989, Fru–Con and Elam entered into a subcontract wherein Elam, as subcontractor, agreed to perform masonry work on the Data Center, and Fru–Con, as general contractor, agreed to pay Elam $4,977,000 for this work ("the Subcontract"). Elam was to begin work on September 1, 1989, and finish by July 1, 1990, nine months later. Time was of the essence. The terms of the General Contract were incorporated into the Subcontract; however, the Subcontract also provided: "IN THE EVENT OF CONFLICT BETWEEN THE CONTRACT DOCUMENTS AND THIS SUBCONTRACT, THE PROVISIONS OF THIS SUBCONTRACT SHALL GOVERN."

Article 3.C of the Subcontract stated in part:

Should Subcontractor be delayed by any act or omission of Contractor, Engineer or

Owner, or by any other cause beyond Subcontractor's control and if the cause of delay is not due to any act or omission of Subcontractor, Subcontractor shall be entitled to request a reasonable extension of time for completion of the Subcontract work.... No payment of any kind, for compensation, or for damages, or otherwise, shall be made to Subcontractor because of any such delay even though Subcontractor's extension of time request be granted, unless Owner is obligated to pay Contractor compensation or damages because of such delay, and then, as and when Owner pays such compensation or damages to Contractor, Subcontractor shall receive that share of such compensation or damages which can be agreed to or proven to have been directly attributable to such delay.

As stated above, the Subcontract's start date was September 1, 1989. However, Fru–Con encountered various problems prior to that date which greatly delayed the Data Center's construction.[1] As a consequence, Fru–Con repeatedly extended the Subcontract's start date by means of written schedule updates and oral representations to Elam, pushing the start date further and further back on the calendar. These schedule extensions resulted in Elam not beginning its work under the Subcontract until November 1, 1990—a delay of fourteen months.

On March 19, 1991, Elam sent Fru–Con what it termed a "formal request for an equitable adjustment to our contract.... based on the delay in the project that has caused [Elam] to incur unanticipated costs." Elam listed $686,083 in damages and requested a change order in that amount, "to compensate Elam Masonry for the damages it has incurred thru [sic] 10/29/89. This change order amount will begin to draw interest, ... April 2, 1991." Elam threatened legal action if the matter was not resolved by that date.

In response, Fru–Con informed Elam it had forwarded Elam's claim to SRC "for

their review and comment." Fru–Con further stated, "As to your demand for immediate disposition, we can only direct you to a thorough reading of the terms and conditions of your contract with us."

Elam replied on April 11, 1991:

It remains the position of Elam Masonry that the fourteen month delay in allowing us to proceed was absolutely unreasonable and beyond the contemplation of the parties, having been caused totally from conditions beyond our control. Accordingly, Elam Masonry expects to be compensated by Fru–Con for our damages whether or not Fru–Con is successful in receiving compensation from the owner....

On August 27, 1991, Elam sent Fru–Con "additional backup information" in support of its claim for damages arising out of the fourteen-month delay, which Elam now set at $699,153. Elam also asserted:

Reference has been made to the subcontract clause which ostensibly bars the subcontractor from collecting delay damages unless the owner compensates the contractor. Although we understand that the information requested herein will pe [sic] presented to the owner as part of Fru–Con's delay claim, we must stress that Elam is entitled to compensation from Fru–Con whether or not Fru–Con is successful in obtaining any or all of its claim from the owner. The 14 month delay to Elam resulted from the affirmative misrepresentations by Fru–Con as to the projected start date, were beyond Elam's control, were unreasonable in duration, and were beyond the contemplation of the parties. There is a significant body of case law indicating that under these conditions, a no damage for delay clause is legally unenforceable....

Attached to this letter was a "Delay Damages Change Order Summary," showing total damages of $699,153; and a "Financial History," showing Elam's income for the years 1984 through 1990.

---

1. Fru–Con did not substantially complete the entire project until March 26, 1992, over a year later than the completion date set forth in the General Contract.

On October 9, 1991, Fru–Con submitted to SRC a "request for an equitable adjustment to our contract for the delays and disruptions relating to issues previously noticed and discussed affecting the building of the data center structure." Elam's claim for $699,153 was included in Fru–Con's request for delay damages, as part of Fru–Con's "Additional Subcontract Costs." Fru–Con also included a copy of Elam's August 27, 1991, letter to Fru–Con, and copies of the Delay Damages Change Order Summary and Financial History accompanying that letter.

On July 23, 1992, Elam filed suit against Fru–Con for breach of contract, requesting damages for underabsorbed overhead, lost profits, labor escalation costs, loss of net worth, and loss of value as a viable ongoing construction company.[2] Elam alleged the following in its petition:

7. Elam was willing and able to commence and complete performance in accordance with the contractually agreed dates, but in spite of repeated oral and written assurances from Fru–Con to Elam as to its Subcontract start date, Elam was not allowed to begin work on the Project until November 1, 1990, fourteen months after the scheduled start and 5 months after its scheduled completion.

\*    \*    \*    \*    \*    \*

10. The 14 month delay to Elam in the start of the job and the affirmative misrepresentations by Fru–Con as to the original start date and subsequent start dates, were beyond Elam's control, were unreasonable in duration and were beyond the reasonable contemplation of Elam at the time the contract was signed.

In its answer, Fru–Con asserted Elam failed to state a cause of action upon which relief could be granted; waived or released all or part of its right to seek the damages sought; and was precluded by the Subcontract from recovering such damages.

2. Elam also presented two other counts, fraud and negligent misrepresentation. The jury returned a verdict in Fru–Con's favor on the fraud claim, which is not challenged on appeal. The

On August 3, 1992, Fru–Con filed a petition against SRC seeking damages for breach of contract, quantum meruit and misrepresentation, asserting SRC materially breached the General Contract by failing and refusing to properly compensate Fru–Con through increases in the contract price and extensions of time for performance of the work. Fru–Con prayed for damages in excess of $20 million.

On August 23, 1994, Fru–Con filed a motion to stay Elam's action pending resolution of its own action against SRC. Referring to Article 3.C of the Subcontract, Fru–Con asserted the provision's purpose

was to clearly provide that Fru–Con would have no liability ... to pay Elam's claims for damages on account of any delays, unless and until Fru–Con received payment for same from the owner of the Project. Implicit in these provisions was Fru–Con's duty to "pass through" Elam's claims to the owner consistent with standard construction industry practice.

According to Fru–Con, "Elam has no right to recover unless and until Fru–Con recovers from the owner." Fru–Con asked that Elam's action be stayed until Fru–Con had exhausted its claims against SRC. This motion was overruled.

Elam's action for breach of contract went to trial before a jury in late January 1995. Both the General Contract and the Subcontract were entered into evidence. It was undisputed that Elam was not responsible for the delay, had satisfactorily completed its work under the Subcontract, and had received full payment of the Subcontract price.

Neal Vogel, the project manager for Fru–Con, testified the fourteen-month delay was not Elam's fault, agreed the delay was "unreasonable" and "excessive," and agreed Fru–Con did not anticipate Elam's work would be delayed for fourteen months at the time it signed the Subcontract. Bill Cart-

negligent misrepresentation claim never went to the jury and was later dismissed with prejudice by consent of the parties.

lidge, vice-president and co-owner of Elam, averred that the fourteen-month delay was not anticipated by Elam when the Subcontract was entered into. Tony Yonovak, president and co-owner of Elam, also averred the fourteen-month delay was not contemplated at the time he signed the Subcontract. There was evidence that Fru–Con had settled claims for delay damages brought by other subcontractors, and that Elam was the only subcontractor to bring its claim for such damages to trial.

At the close of all the evidence, Fru–Con filed a motion for directed verdict on Elam's breach of contract claim, alleging in part that "[t]he Subcontract expressly provides for Fru–Con to submit any delay claims Elam may have to [SRC] and for Elam to await payment of those claims by [SRC].... The evidence has clearly shown that Fru–Con complied with its contractual duties in this regard." Fru–Con's motion was overruled.

The trial court submitted (over Fru–Con's objection) Instruction No. 5, which stated:

> The issue raised by Subcontract clause 3(c) is withdrawn from the case and you are not to consider such issue in arriving at your verdict.

The verdict director submitted to the jury (also over Fru–Con's objection) ordered the jury to return a verdict for Elam if it believed (1) Elam and Fru–Con entered into an agreement whereby Elam agreed to perform masonry work for the construction of the Data Center and Fru–Con agreed this work would start on September 1, 1989, (2) Elam performed its agreement, (3) Fru–Con failed to perform its agreement and (4) Elam was damaged. The issue of whether Fru–Con caused the delay of Elam's work was not an element of Elam's action for breach of contract and was not submitted to the jury; nor was there any finding in the record that Fru–Con did in fact cause the delay.

The jury returned a verdict in favor of Elam on the breach of contract claim and

awarded Elam damages of $600,000. This judgment was entered by the trial court that same day, January 25, 1995.

Fru–Con filed post-trial motions for judgment notwithstanding the verdict or, in the alternative, a new trial.[3] Fru–Con alleged, *inter alia*, it had fully performed according to the terms of the Subcontract, and the trial court erred in submitting Instruction No. 5 and removing Article 3.C from the jury's consideration. The trial court denied Fru–Con's motions on March 31, 1995. This appeal followed.

■ As noted above, we find the first of Fru–Con's eight points on appeal dispositive of this case. Fru–Con contends the trial court erred in not entering judgment in its favor, since Article 3.C barred Elam's claim for delay damages against Fru–Con. We agree. Elam's damages were solely attributable to the fourteen-month delay of its performance under the Subcontract. Under the unambiguous language of Article 3.C, Elam was precluded from seeking such damages unless SRC was obligated to Fru–Con for the same. The record shows Fru–Con included Elam's claim for delay damages in its own claim against SRC, which is still pending. Elam's action was, at best, premature.

Elam offers several rationales in support of the trial court's deletion of Article 3.C, contending (1) exceptions to the enforcement of similar clauses, recognized in other jurisdictions, applied here as well; (2) the exculpatory language of Article 3.C should not have been enforced as a matter of law due to ambiguities in the language of the clause and in the Subcontract as a whole; and (3) Article 3.C was contrary to Missouri public policy. We are not persuaded by any of these arguments.

Elam first presents an argument based on case law from other jurisdictions, recognizing an exception to otherwise enforceable "no damages for delay" clauses in construction contracts where the delay in question was

---

3. Elam also filed a post-trial motion for amendment of the judgment, to include an additional $205,902.62 in prejudgment interest. This motion was granted.

not contemplated by the parties or reasonably foreseeable at the time the contract was entered into. According to Elam, as witnesses for both parties agreed at trial that the fourteen-month delay was unreasonable in duration and within neither party's contemplation at the time the Subcontract was signed, this exception applied here.

Missouri courts have not had occasion to address "no damages for delay" clauses in construction contracts. Decisions from other jurisdictions interpreting these clauses all hold them generally enforceable, but split as to whether these clauses remain enforceable when the delay in question was not contemplated by the parties at the time they entered into the particular contract. Decisions recognizing such an exception to the enforceability of "no damages for delay" clauses rely on the concept of "mutual assent:"

> Having agreed to the exculpatory clause when he entered into the contract, it is presumed that the contractor intended to be bound by its terms. It can hardly be presumed, however, that the contractor bargained away his right to bring a claim for damages resulting from delays which the parties did not contemplate at the time.... Thus, even broadly worded exculpatory clauses, ... are generally held to encompass only those delays which are reasonably foreseeable, ....

*Corinno Civetta Const. v. City of New York*, 67 N.Y.2d 297, 502 N.Y.S.2d 681, 686, 493 N.E.2d 905, 910 (1986) (citations omitted). *See also J & B Steel Contractors v. C. Iber & Sons*, 162 Ill.2d 265, 205 Ill.Dec. 98, 104, 642 N.E.2d 1215, 1222 (1994); *City of Seattle v. Dyad Const., Inc.*, 17 Wash.App. 501, 565 P.2d 423, 433 (1977). On the other hand, decisions refusing to recognize this exception hold that

> parties can mutually assent to such a clause without contemplating in particularity all of the potential causes of delay. Indeed, the adoption of a "no damage for delay" clause shows that the parties realize that some delays cannot be contemplated at the time of the drafting of the contract.

The parties include the clause in the contract in order to resolve problems conclusively should such delays occur.... Knowing that unforeseen delays ... can occur, parties can bargain accordingly. A subcontractor can protect itself from the risk of unforeseen delay simply by adjusting its bid price in recognition of the potential additional costs or by refusing to accept such a provision in the contract.

*Gregory & Son, Inc. v. Guenther & Sons*, 147 Wis.2d 298, 432 N.W.2d 584, 587 (1988). *See also State Highway Admin. v. Greiner*, 83 Md.App. 621, 577 A.2d 363, 369–372 (1990); *Western Engineers, Inc. v. State Road Commission*, 20 Utah 2d 294, 437 P.2d 216, 218 (1968).

■ Turning to the provision before us, we note Article 3.C was not, in fact, a "no damages for delay" clause at all. Elam was not absolutely barred from seeking damages for delay, but may recover, through Fru–Con, its share of those delay damages for which SRC is liable. Elam's right to recover delay damages was, and is, contingent upon the success of Fru–Con's pending action against SRC.

■ We see no reason why this unambiguous provision could not be enforced as written. This Court has upheld clauses in private contracts that limited liability for damages in even broader terms, provided the clauses were not ambiguous, unconscionable, or void as against public policy. For example, in *World Enterprises, Inc. v. Midcoast Aviation*, 713 S.W.2d 606, 608–611 (Mo.App.E.D.1986), we held an unambiguous contractual provision excluding liability for incidental and consequential damages served as a complete defense to plaintiff's action for loss of use damages, and entitled defendant to judgment as matter of law. Also, in *Liberty Fin. Mgmt. v. Beneficial Data*, 670 S.W.2d 40, 46–50 (Mo.App.E.D. 1984), we reversed the trial court's withdrawal of a contractual provision from the jury's consideration, where the provision in question exonerated the defendant from liability for breach of contract unless the

breach resulted from its willful or grossly negligent acts (and even then limited damages to "out-of-pocket" losses).

Here, the Subcontract was agreed to by two experienced commercial entities, in equal bargaining positions. There were no findings of fraud or misrepresentation on Fru–Con's part (in fact, the jury specifically found in favor of Fru–Con on this issue, as set forth in Count II of Elam's petition). Article 3.C was not buried in the Subcontract's small print. Its terms were readily ascertainable, and applied to all delays, regardless of whether the delay was contemplated or reasonably foreseeable by the parties. We see no unconscionability, procedural or substantive, barring the application of Article 3.C to the delay at issue here.

■ Elam next attempts to argue Article 3.C was ambiguous, both in its own terms and when read in conjunction with Sections 5.3, 8.3.4, and 9.9.2 of the General Contract incorporated into the Subcontract. We perceive no ambiguity in Article 3.C's own terms. Article 3.C provided that "[s]hould Subcontractor be delayed by any act or omission of Contractor, Engineer or Owner, ... [n]o payment of any kind, for compensation, or for damages, or otherwise, shall be made to Subcontractor because of any such delay ... unless Owner is obligated to pay Contractor compensation or damages because of such delay, ...." As Article 3.C was susceptible to only one reasonable interpretation, it was clear and unambiguous, and its construction became a matter for the trial court rather than the jury. *World Enterprises,* 713 S.W.2d at 610.

■ Nor do we agree Article 3.C conflicted with Sections 5.3, 8.3.4, and 9.9.2 of the General Contract, creating an ambiguity in the Subcontract as a whole. Elam contends Sections 5.3 and 8.3.4, when read together, gave Elam the right to seek delay damages against Fru–Con in the same manner that Fru–Con could seek such damages against SRC, thereby conflicting with Article 3.C. We do not agree. It is true Section 8.3.4

permitted the recovery of damages for delay by either of the parties to the General Contract, and Section 5.3 allowed subcontractors the benefit of all rights, remedies and redress against Fru–Con that Fru–Con had against SRC. However, Section 5.3 included the qualifier, "unless specifically provided otherwise in the Contractor–Subcontractor agreement[.]" Section 5.3 expressly deferred to contrary provisions in the Subcontract, such as Article 3.C. There was no conflict between Article 3.C and Sections 5.3 and 8.3.4.

■ Elam also claims a conflict between Article 3.C and Section 9.9.2. The latter provision stated, in part, that no final payment was due Fru–Con on the General Contract until Fru–Con had proven it paid or otherwise satisfied all indebtedness and obligations connected with the work, i.e., subcontracts. According to Elam, Section 9.9.2 and Article 3.C (requiring SRC to have paid delay damages to Fru–Con before Elam could recover its own delay damages) were "mutually exclusive."

Again, we disagree. Section 9.9.2 addressed the mechanics of SRC's final contract payment to Fru–Con, requiring Fru–Con to prove it had satisfied its subcontractual obligations. It was undisputed that Fru–Con paid Elam what it owed under the Subcontract. Fru–Con owed Elam no other contractual obligations; Article 3.C precluded any potential liability to subcontractors for delay damages. There was no conflict between Article 3.C and Section 9.9.2, as they addressed entirely different matters. The cases cited by Elam on this point involved conditions precedent to payment for performance, not consequential delay damages, and are inapposite.

■ Elam raises one other argument based on the General Contract. Section 5.3 orders Fru–Con to identify to Elam any terms and conditions of the Subcontract "which may be in variance with the Contract Documents." Elam claims Fru–Con failed to adduce evidence that it identified to Elam

any terms and conditions of the Subcontract in variance with the General Contract. This argument is without merit. We see no conflict between Article 3.C of the Subcontract and the terms of the General Contract requiring such identification. In sum, there were no ambiguities in the Subcontract preventing enforcement of Article 3.C.

For its third argument in favor of the trial court's withdrawal of Article 3.C, Elam contends this clause was contrary to Missouri public policy as expressed by the state legislature in RSMo § 34.058.2 (1994):

> Any clause in a public works contract that purports to waive, release, or extinguish the rights of a contractor to recover costs or damages, ... for delays in performing such contract, if such delay is caused in whole, or in part, by acts or omissions within the control of the contracting public entity or persons acting on behalf thereof, is against public policy and is void and unenforceable.

This statute applies to public works contracts, not to contracts between private entities. Provisions in private contracts limiting or excluding liability for consequential damages have been held not violative of public policy, provided the limitation or exclusion was not unconscionable. *World Enterprises,* 713 S.W.2d at 611. Article 3.C was freely bargained for and agreed to by private parties experienced in this field. Further, Elam can still recover delay damages if SRC is obligated to Fru–Con for the same; its right to seek such damages has not been extinguished. As such, enforcement of Article 3.C was not against public policy.

Elam's claim for damages was based solely on the fourteen-month delay of its work. Under the unambiguous language of Article 3.C, Elam was precluded from seeking damages for this delay unless Fru–Con recovered delay damages from SRC. The judgment of the trial court is reversed and cause is remanded for dismissal of Elam's action as premature.

SMITH, P.J., and RUSSELL, J., concur.